Stall v. The Catskill Bank.

---

## STALL and others *vs.* THE CATSKILL BANK.

The liability of *partners* considered, where the name of the firm as *endorsers* of a promissory note is affixed by one of the partners, for the *accommodation* of a third person, in a matter not relating to the business of the firm, without the knowledge or assent of the others, and the note is passed into the hands of a *bona fide* holder. The cases upon this subject reviewed and commented upon by the CHANCELLOR and by *Senator* TRACY.

In an action by a *bank* for the recovery of a promissory note, it is no objection to the *competency* of a witness, that he had been a *stockholder* and had sold out his interest to avoid an objection to his competency, although he avow his intention of repossessing himself of the stock, and declare that he expects to obtain it at the same price at which he had sold : there being no understanding, however, between him and his vendee, that the stock should be re-transferred. The objection in such case goes only to the *credibility* of the witness.

The *belief of a witness* that he is interested in the event of the suit, or a *feeling of honorary obligation* to the party calling him, *it seems,* is no objection to his competency, if in fact he has no legal or equitable interest in the event of the suit.

ERROR from the supreme court. This was an action by the Catskill Bank against Jacob I. Stall, John I. Traver, and Henry Teats, junior, on a promissory note drawn by one Edward Shook, for the sum of $1000, payable to the defendants, who transacted business together under the partner-[467] ship name of *J. I. Stall & Co.* The note was endorsed by Teats, one of the defendants, in the partnership name, for the *accommodation* of Shook, the maker of the note. *Stall* did not know of the transaction at the time of the endorsement, and never gave his assent to it. Shook sent the note to a Mr. Outwater, requesting him to have it presented at the Catskill Bank for discount. Outwater sent an agent, of the name of Reynolds, to the bank for that purpose, but the note was not then discounted. A day or two afterwards, *Traver,* one of the firm of J. I. Stall & Co., desired Reynolds to offer the note again for discount at the bank. Reynolds went accordingly, and on his way to Catskill obtained the name of another person as an additional endorser, presented the note at the bank, and it was then discounted. Reynolds informed the cashier that *Traver* resided at *Redhook,* and substantially told him to direct such letters as he might wish to send to the parties, to *Redhook.* The cashier, H. Hill, jun., testified that he, as notary of the bank, protested the note and sent a notice of protest, directed to the defendants in their partnership name, per mail to *Redhook.* *Stall,* who alone defended this suit, proved that the place of business of his firm was in the town of *Milan,* and that there was a post-office in that

2+6

Stall *v*. The Catskill Bank.

town.   When Mr. Hill was called as a witness, he was objected to on the ground of interest; whereupon he was sworn on his *voir dire*, and testified that at noon of the day of the trial of the cause he was a stockholder in the Catskill Bank that understanding he would be called as a witness in the cause, he sold out his stock to his brother-in-law, Mr. Hopkins, who paid him for the same; that he expected to get it back again, upon paying the same that he got for his stock; that there was no understanding, however, that Hopkins should re-transfer or sell it back to him, but he expected that he would do as he should request him, and that he expected he would re-transfer it to him.   He further testified that he had no interest in the event of the suit, and that it would make no difference to the plaintiffs whether they recovered or not, as they were fully indemnified. The circuit judge ruled in favor of the competency of the witness, and he was sworn in chief.   The counsel for the defendant excepted.   Mr. Hill testified that he *understood* from *Reynolds*, the agent of Outwater and Traver, [468] that the money, if the note was discounted, would be paid out by the firm of *J. I. Stall & Co.* in the purchase of grain.   As to this point, *Reynolds* testified that he did not recollect what he told Mr. Hill as to whom the money was for, but he told him whatever he was directed by Traver.   He also testified that he did not know for whose benefit the money was.   The evidence being closed, the defendants' counsel insisted, among other things, that whether the plaintiffs or their agents were or were not informed for whom the note was discounted, they were not entitled to recover, because it had been proved affirmatively that the name of the firm was endorsed by *Teats* when *Stall* was not present, and without his knowledge; that the endorsement was made for the exclusive benefit of *Shook*, the maker of the note, and was in no wise connected with the business of the firm.   It was also insisted that the notice of protest was insufficient.   The judge charged the jury that the notice of protest was sufficient, and upon the other point in the case, " that if the plaintiffs had *any knowledge* that the note in question was endorsed by Teats without the knowledge of Stall, for the benefit of another person, they could not recover; but that the plaintiffs being the holders of the note as negotiable paper, were entitled to recover against the defendant, Stall, if they received the note in *good faith*, without knowledge that Stall had not assented to the endorsement, although it was endorsed by one of the partners in the name of the firm, without his knowledge or assent, and for the accommodation and benefit of the drawer alone.   The jury found a verdict for the plaintiffs.   The defendant having excepted to the charge of the judge and to the decisions made by him during the trial, applied to the supreme court on a bill of exceptions for a new trial; which application was denied, and judgment rendered for the plaintiffs. (See opinion delivered in supreme court, 15 *Wendell*, 366).   The defendant sued out a writ of error.

The cause was argued in this court by

*C. Bushnell*, for plaintiff in error.                               [469]

*M. T. Reynolds*, for defendants in error.

*Points insisted on in behalf of plaintiff in error:*

I. The plaintiff in error, Jacob I. Stall, was not bound to the defendants in error, on the endorsement of the note in question, because, 1. The endorsement of Jacob I. Stall & Co's name on the note was not in the business of the firm, nor for the benefit of the firm, or of any member of the firm, nor with the authority, knowledge, or consent of Jacob I. Stall.   (*Bank of Rochester* v. *Bowen*, 7 *Wendell*, 158.   *Boyd* v. *Plumb*, *id.* 309.   *Laverty* v. *Burr*, 1 *id.* 529.   *Livingston* v. *Hastie*, 2 *Caines*, 246.   *Same* v. *Tyrie*, *id*.)   2. As this note was repeatedly presented to the cashier in an unfinished state, by a man who was not the owner, payee or endorser, nor the agent of either, and who did not pretend that the note had yet a valid existence, with available ownership in any person; these circumstances, with the nature of the transaction, were intrinsically notice to the cashier that he was dealing with the drawer of the note, and that the names
247

endorsed were for his accommodation, and as his sureties. (*Brown* v. *Taber*, 5 *Wendell*, 569. *Livingston* v. *Roosevelt*, 4 *Johns. R.* 271, 272, by *Kent, Ch. J. Green* v. *Deakin*, 2 *Stark. R.* 207.) 3. The plaintiffs below were original parties to the note, as the cashier well knew they would be when he took it; and against such original parties it is a good defence that the name of any defendant was put on it for an illegal purpose, without authority, and without consideration; that the consideration has failed; that the note was delivered as an escrow. (*Pearson* v. *Pearson*, 7 *Johns. R.* 26. *Vallett* v. *Parker*, 6 *Wendell*, 619, 20. *The People* v. *Fleming*, 12 *id.* 246.) 4. The representations of the drawer of a note, or of his agent, cannot in any way be made available evidence in favor of the first holders against a person who was ignorant of the note, and of such representations at the time, and who never authorized or consented thereto, especially if such representations are false. (*Gansevoort* v. *Williams*, 14 *Wendell*, 135, 138, 139.) 5. Public policy forbids it. If a copartner is held liable in such a case the weak will fall into the temptation; the dishonest will practice frauds with impunity; and private rights and public morals will both be sacrificed or in imminent danger, unless copartnerships (which should be encouraged) are abandoned. 6. The rights of all parties will be fully protected, and without inconvenience, by imposing on the first holder the necessity of ascertaining that all the names on the note are there by proper authority.

II. The circuit judge erred in charging the jury that the plaintiffs below were entitled to recover if they received the note in good faith, without knowledge that Stall had not assented to the endorsement; because, 1. For the reasons above stated, the cashier was bound to ascertain that Stall had assented to the note, or that it was in fact in the business of the firm, before he and a stranger to the firm could make the note a valid security against the firm. 2. Because in such case, ignorance, if he was ignorant, was his own fault, and not the fault of Stall; and if there must be a loss, " it should fall on the one who has enabled a third person to occasion the loss, and not on the innocent." (*Vallett* v. *Parker*, 6 *Wendell*, 620. *Lickbarrow* v. *Mason*, 2 *T. R.* 70, *Ashurst, Justice.*)

III. There was not legal notice, actual or constructive, to Jacob I. Stall, or to Jacob I. Stall & Co., of the dishonor of the note, nor any diligence to excuse the want of notice. 1. There was a post-office in the town, and near the residence of Stall, and store of the firm, and no notice was directed there or to the town. 2. There were two post-offices in the town where Traver lived, nearer than the one to which notice was sent, and one of them was in the village where he lived. (*Chapman* v. *Liscomb*, 1 *Johns. R.* 294. *Ireland* v. *Kipp*, 11 *id.* 232. *Bank of Utica* v. *De Mott*, 13 *id.* 432.) 3. The cashier was informed where, in what village, each one of the firm resided, and in what village the firm did business. (*Bank of Geneva* v. *Hewlett*, 4 *Wendell*, 328. *Cuyler* v. *Nellis, id.* 399. *Reid* v. *Payne*, 16 *Johns. R.* 280.)

IV. The circuit judge erred in charging the jury, that if the cashier inquired of Reynolds as to the residence of the endorsers, and was informed by him that Redhook was the place nearest and most proper to direct a notice to them, it was sufficient diligence, and that the notice sent to Redhook charged the defendant; because, 1. His representations were not authorized by Stall. 2. His representations as to the residence of the endorsers showed they did not reside at Redhook, or where it was proper to send a notice for them to Redhook office. 3. The cashier had no right to act on the opinion of the witness, contrary to the law which required a notice to be sent to the post-office nearest to them.

V. Hiland Hill was improperly admitted as a witness for the plaintiffs, and without his testimony the verdict must have been for the defendant; because, 1. The sale of his stock was collusive and fraudulent as it regarded the defendant—was a mere artifice to enable him to testify for his own benefit—and was not *bona fide*—and his interest was in fact the same as if he had not pretended

Stall v. The Catskill Bank.

to sell his stock. (12 *Vin.* 12, § 38 ; *Trustees of Lansingburgh* v. *Willard*, 8 *Johns. R.* 334 ; *Frothingham* v. *Greenwood*, 1 *Stra.* 129 ; *Richardson* v. *Hunt*, 2 *Munf.* 148 ; *Plumb* v. *Whiting*, 4 ; *Mass. R.* 518 ; *Peter* v. *Brall*, 4 *Harr. & McHen.* 342 ; *Skillenger* v. *Bolt*, 1 *Conn. R.* 147.)    2. The witness testified under the full conviction and expectation of deriving benefit from his testimony. (1 *Stra.* 129 ; 2 *Stark. Ev.* 746, 7 ; *Peyton* v. *Hallett*, 1 *Caines*, 364, 379.) 3. There is intrinsic evidence that he testified under such bias, and uncandidly ; or that under such bias he had forgotten what he should have remembered. (*Powell* v. *Gordon*, 2 *Esp. R.* 735 ; *Innes* v. *Miller*, 2 *Dallas*, 50 ; *McVeaugh* v *Goods*, 1 *id.* 62 ; *Moore* v. *Hitchcock*, 4 *Wendell*, 296, 7.)

*Points insisted on in behalf of defendants in error :*

I. Hill having transferred his stock to Hopkins, was divested of all interest, and a competent witness. The hope or belief of witness, that Hopkins would retransfer the stock to him, went to his credibility only, and not to his competency. (*Van Ness* v. *Terhune*, 3 *Johns. Ch.* 82 ; *Gilpin* v. *Vincent*, 9 *Johns. R.* 219 ; *Utica Bank* v. *Smalley*, 2 *Cowen*, 770 ; *Williams* v. *Matthews*, 3 *id.* 252 ; *Utica Ins. Co.* v. *Cadwell*, 3 *Wendell*, 296 ; *Moore* v. *Hitchcock*, 4 *id.* 292 ; [472] *Ten Eyck* v. *Bill*, 5 *id.* 55.)

II. Notice to an endorser is a question of reasonable diligence, compounded of law and fact, and to be submitted to a jury. In this case the notary used reasonable diligence in making the inquiry, and was justified in sending the notice to Redhook, inasmuch as Reynolds, the person who presented the note for discount, told the cashier, Hill, that Traver lived at Redhook, and that by directing letters to that place, they would get them sooner than anywhere else. (*Taylor* v. *Bryden*, 8 *Johns. R.* 173 ; *Chapman* v. *Liscomb*, 1 *id.* 294 ; *Bank of Utica* v. *Smith*, 18 *id.* 230 ; *Bank of Utica* v. *Davidson*, 5 *Wendell*, 587 ; 7 *id.* 309.)

III. A notice to one partner is a sufficient notice to all the partners of the firm. (*Chitty on Bills*, 230 ; 1 *Maule & Sel.* 259 ; *Jacand* v. *French*, 12 *East*, 317 ; *Porthouse* v. *Parker*, 1 *Campb.* 82.)

IV. The verdict of the jury, under the charge of the court, settled the question of fact, that the cashier, Hill, who was also the notary, had used reasonable diligence, and was justified in sending the notice to Redhook.

V. The plaintiffs received the note in good faith, and without knowledge that the endorsement of J. I. Stall & Co. was made as surety for Shook, the drawer of the note ; and the law merchant, for the convenience and safety of commercial business, protects the *bona fide* holder of partnership paper, even when drawn by one of the firm for his individual benefit or as surety for a third person. (*Boyd* v. *Plumb*, 7 *Wendell*, 309 ; *Dobb* v. *Halsey*, 16 *Johns. R.* 38 ; *Foote* v. *Sabin*, 19 *id.* 154 ; *Laverty* v. *Burr*, 1 *Wendell*, 529 ; *Bank of Rochester* v. *Bowen*, 7 *id.* 158 ; *Gansevoort* v. *Williams*, 14 *id.* 133.)

After advisement, the following opinions were delivered :

By the CHANCELLOR.    Three questions are presented for consideration on this writ of error : 1. Whether Hill was a competent witness, after having transferred his stock ; 2. Whether the defendants in error were legally chargeable with notice that J. I. Stall & Co. had endorsed the note as mere [473] sureties, and that all the copartners had not assented to such endorsement ; and 3. Whether the notice of protest was sufficient.

It is a technical rule, that a witness who has any interest, either legal or equitable, in the event of a suit, however small that interest may be, is not a competent witness for the party in favor of whose success that interest is. A stockholder of a bank, or other corporation, who may gain or lose a single cent, or even a fractional part thereof, by the event of a suit brought by or against the corporation of which he is such stockholder, is therefore an incompetent witness for such corporation, although he may be called and compelled to testify as a witness in favor of the adverse party. But if he sells his stock, this technical objection

249

Stall *v.* The Catskill Bank.

is removed, and he is then a competent witness for either party, without reference to the time or the reasons for which such sale was made, unless he has reserved to himself upon the sale a legal or an equitable right to compel a re-transfer of the stock, or some interest therein, or is liable to make good to the purchaser any diminution in value the stock may sustain by a verdict adverse to the interests of the corporation. Such a sale, when made for the purpose of restoring the competency of the stockholder to be a witness in behalf of the corporation, is precisely of the same character as the ordinary releases which are constantly executed in other cases, at or before the trial of the cause, for the purpose of removing either a technical or substantial interest in the person who is wanted as a witness, and to restore his competency. The competency of the witness in this case must, therefore, be decided upon the same principles which are applicable to a person who is offered as a witness after the execution of such a release. The recent case of *Oates* v. *Wacter's Heirs,* in the supreme court of South Carolina, (2 *Hill's Law R.* 442,) is directly in point on this question. The object of that suit was to establish a will which had been lost. The scrivener who drew the will was offered as a witness to prove its contents, and the correctness of the copy

[474] produced, so as to entitle it to probate. The witness being objected to as incompetent, on the ground of interest, because he was entitled to a legacy under the will, immediately conveyed his interest in the legacy to W. C. Preston, in court, without any actual consideration and without warranty, for the purpose of restoring his competency. It was objected by the heirs that an assignment or deed of gift to a third person was not a release or relinquishment of the legacy, and did not render the witness competent. The circuit court overruled the objection, on the ground that the assignment was equivalent to a release; and upon an appeal to the supreme court, this decision was confirmed. Judge O'Neall, who delivered the opinion of the supreme court of appeals, after adverting to the ordinary and well-settled practice of restoring the competency of a witness by a release at the trial, says the term *release* in such a case is not to receive a technical meaning. The intention of the legal rule is to divest the witness of an interest in the event of a suit, and anything which accomplishes that object will satisfy the rule; and in answer to arguments similar to those which were urged in the present case, he says: "It is true, as was stated by the ingenious counsel for the defendants, who presented an admirable argument for them, that this rule may be abused, and that bad men may pervert it to bad purposes. This, however, is the case with all human institutions and rules. The jury is one of the protections of a law court from perjury; and it is for them to believe, or disbelieve, a witness who comes before them, and assigns his interest to support it. He may, notwithstanding this circumstance, be pure and worthy of confidence; and if so, they ought to credit him. If, on the other hand, he should be impure and unworthy of confidence, notwithstanding his legal competency, the jury will discredit him. The cases of *The Utica Ins. Co.* v. *Cadwell,* (3 *Wendell,* 296,) and *The Bank of Utica* v. *Smalley,* 2 *Cowen,* 770,) are the same in principle, except that in those cases it was an assignment of stock instead of a legacy. The objection that the witness said he had sold his stock, but did not say whether he had *assigned* it, amounts to nothing. It must be recollected that he was then under ex-

[475] amination as the defendant's witness to show him incompetent; and a declaration that he had sold it, imported that he had done all that was necessary to divest his interest, unless the contrary was shown by further inquiries. In one of the cases above referred to, the court decided that an actual transfer of the stock on the books of the company was not necessary to divest all his legal and equitable right to it as against himself; and in *Heath* v. *Hall,* (4 *Taunton,* 326,) where a creditor, interested in a special fund to be recovered in the suit, had sold his debt to another creditor, who gave him credit therefor at a discount, and was to stand in his right, he was held to be a competent witness, although there was no written assignment of the debt.

Stall v. The Catskill Bank.

The question, whether a witness who really believes himself to be legally interested in favor of the party calling him, although in fact not thus interested, does not properly arise here, as there is no foundation for saying that Hill supposed himself thus interested after having sold his stock for the very purpose of removing any such interest. That question, which in England refers itself back to the *nisi prius* case of *Fotheringham* v. *Greenwood*, before Ch. J. Pratt, in 1718, (1 *Strange's R.* 129,) appears, by the English writers upon the law of evidence, to be still an unsettled question there; and the decisions in our sister states appear to be nearly equally divided on the subject. It is settled in Scotland, that a witness who has no legal interest is competent, and that his belief that he has a legal interest in behalf of the party calling him, only goes to his credibility. (*Kriton* v. *Lang*, 4 *Murray's R.* 46; *Tait's Law of Ev.* 351.) In our own state, it rests upon the *dictum* of a judge of the former supreme court in the *Lansingburgh goose case*, (8 *Johns. R.* 428,) which came before that court upon certiorari. The only real question in that case was, whether a witness declaring himself interested, but showing that his only interest, if any, was against the party calling him, could be rejected as incompetent, on the application of the party in whose favor the interest was. The rule which the court intended to establish in that case as an authoritative decision was, that if the imaginary interest of the witness was against the party calling him, who was willing to run the risk [476] of the bias on the mind of the witness, he must be sworn. It may, therefore, be fairly considered as an unsettled question here.(a) Those who contend for the rule of exclusion of the witness, on the ground of his supposed interest in favor of the party calling him, I believe, however, admit that it must be a legal interest which he supposes himself to have; and that if he declares on his *voir dire* that he has no interest, he is to be admitted, unless the court sees from the facts stated by him that an actual interest exists. (6 *Rob. Adm. R.* 269, *n.*; 4 *Har. & McHenry*, 342; 2 *J. J. Marsh R.* 390.) And notwithstanding the supposed decision of Parker, C. J., mentioned in *Fotheringham* v. *Greenwood*, that the witness' believing himself in honor bound, although he knew he had no legal interest, was incompetent, the law appears to be well settled at the present day that such an honorary obligation will not render the witness incompetent. (1 *Camp. R.* 144; 6 *Conn. R.* 365; 9 *Johns. R.* 219; 4 *Wendell*, 292; 4 *Bibb's Ky. R.* 330; 4 *Serg. & Rawle*, 227; *Gresl. on Ev.* 253.) Neither is a witness disqualified from giving evidence, because he depends upon the readiness or willingness of another to give him a benefit from recovery, where such other person is under no legal or equitable obligation to do so, and where the witness is well aware that no such obligation exists. (5 *Rob. Adm. R.* 343, *n.*; 1 *Hayw. R.* 256.) If the decision as to the admissibility of witnesses is to depend upon the question, whether they are interested in the event of the suit, which interest is capable of being ascertained or defined as one which is known to our laws as a legal or equitable interest, capable of being operated upon by legal or equitable remedies, we shall have a rule for determining between objections which go to the *competency* and those which go merely to the *credibility* of witnesses, which, to some extent at least, is capable of being understood, and of being acted upon by courts of justice; but if we once lose sight of this rule, and attempt to exclude witnesses upon [477] the ground of mere belief or of honorary obligation, or of undefined and uncertain hopes or expectations of benefit, we shall find ourselves afloat upon the broad ocean of conjecture and uncertainty, "out of sight of all landmarks, without a compass to steer by, or a rudder to guide our course." For these reasons I think Hill was a competent witness, and that the jury were the proper judges of his credibility.

I think there was no legal objection to the charge of the judge upon the second question. It proceeded upon the supposition, that one of the defendants

---

(a) But see Commercial Bank v. Hughes, since reported, 17 Wendell, 94

Stall v. The Catskill Bank.

signed the name of the firm to the note without the consent or authority of Stall one of the copartners, and as mere sureties for a third person, for whose benefit the moneys afterwards received from the bank thereon were actually applied. The jury were told if the plaintiffs had any knowledge of these circumstances, they could not recover; but that being the holders of the note, they were entitled to recover on it as negotiable paper, if they received it in good faith and with-out such knowledge that it had been so endorsed without the authority of some of the copartners, and for the accommodation of the drawer. In this charge, therefore, the judge distinctly recognized the principle established by the supreme court in *The Bank of Rochester* v. *Bowen*, (7 *Wendell*, 158,) and in the case of *Joyce* v. *Williams*, (14 *id.* 141,) that if a party takes negotiable paper, either made or endorsed *by one of the partners* of a firm in the partnership name, *knowing* the name of the firm was endorsed *merely as surety*, he takes it at his peril, and he cannot charge the members of the firm who have not assented to the transaction. There certainly was sufficient evidence in this case that the cashier did not know that the name of the firm was signed to the note as a mere surety, to make it the duty of the judge to submit the case to the jury. The principle of the cases referred to is this: that it is no part of the ordinary business of a mercantile firm to make or endorse notes as the sureties for third persons, or to pay the private debts of the individual partners, and of course there is no implied authority [478] for one member to endorse or affix the name of the firm to negotiable paper, in which the partnership has no interest, for such purposes. If, therefore, it appears upon the face of the paper, that the partnership name is signed as a mere surety for some other person, the party who takes the note from such person has actual notice of the fact that it is not signed in the ordinary course of partnership business. He must, therefore, at his peril, make the necessary inquiries, and ascertain that there was some special authority for one partner to sign the partnership name as such surety, either express or implied. So, if the drawer of a note carries it to a bank to get it discounted on his own account, or transfers it to a third person with the name of a firm endorsed thereon, the transaction on its face shows that it is a mere accommodation endorsement, or the note would not be in the hands of the drawer; and the bank or person who receives it from the drawer, being thus chargeable with notice that the firm are mere sureties of the drawer, and that it has not passed through their hands in the ordinary course of partnership business, the members of the firm who have been made sureties without their consent, are not liable to such holder of the note. But if the note is in the hands of a third person, with an endorsement of the name of the firm upon it, the legal presumption is that it belongs to him or those for whom he professes to act; and the person taking it from him *bona fide*, without notice of the fact that the firm were mere sureties, will be protected, although it afterwards appears that it was a case of mere suretiship, and that the name of the firm was signed by one of the members thereof without authority. In this case, if, at the time note was discounted, the cashier knew or had reason to believe the note was discounted for Shook, the drawer, and that the defendants' firm had no interest therein, except as his accommodation endorsers, they are not liable, as there was no evidence that Stall authorized or assented to the endorsement of the note as surety for Shook, or that the different members of the firm were in the habit of making accommodation endorsements in the name of the firm. But if the cashier supposed he was discounting the note for [479] the benefit of Stall & Co., or of any of the subsequent endorsers, the plaintiffs are *bona fide* holders of the note and of this particular endorsement thereof, as against all the members of the firm, although, in point of fact, the money was obtained for Shook, and not for them.

When the note was first taken to the bank, nothing transpired from which the cashier had any reason to suppose *Reynolds*, the bearer, was not himself the owner of the note; and the loan of money upon it was refused, merely because

Stall v. The Catskill Bank.

the cashier was not satisfied with the names upon it. When the note was sent back the second time, with the addition of Russell's name as an endorser, Reynolds swears he did not tell the cashier Shook wanted the money, as he did not know who it was for; but he told him whatever the defendant Traver had directed him to say. Hill swears that Reynolds told him the money was to be paid out by Stall & Co. to purchase grain at their store. I think, therefore, it was satisfactorily established that the cashier not only supposed, but had reason to believe, that the note was actually discounted for the benefit of the defendant's firm, and that he had no reason even to suspect they were accommodation endorsers for Shook, the drawer. The plaintiffs were therefore *bona fide* holders of the endorsement of this firm, and are not chargeable with any notice of the matters now set up as a defence by the defendant Stall. I think it is also very evident, from the testimony, that when Traver sent Reynolds to the bank the second time with the note, the latter was instructed by him to represent that the note was to be discounted for the firm to buy grain. So far, therefore, as the rights of the plaintiffs were concerned, Reynolds was the agent of the firm for the purpose of getting the note discounted, although Traver was practising a fraud upon his copartner Stall, as well as upon the bank. The firm are bound by all the representations made by such agent in connection with the objects of his mission, to the same extent that all the defendants would have been bound if Traver had been there himself, and had made the same representations as a member of the firm. Under these circumstances, the sending of the notice of protest, as directed by the agent, Reynolds, was sufficient to charge the firm as en- [480] dorsers of the note. I therefore think this judgment should be affirmed.

By Senator TRACY. It was fully established on the trial of this cause, that the name of the firm, of which the plaintiff in error was a member, was endorsed on the note by another member of the firm without his knowledge, and that such endorsement was not made in the regular business of the partnership, but for the accommodation of a third person; and it is contended that the circumstances under which the note was offered for discount were sufficient to apprise the cashier of the bank that he was dealing with the drawer of the note alone, and that the other parties to it were merely accommodation endorsers, or sureties for the drawer. Upon this state of facts the defendant Stall insisted, that not having in his own person endorsed the note, nor assented to the endorsement of the name of the firm by his copartner, he is not liable as an endorser, notwithstanding the party taking the note had no knowledge that he was not in fact, as well as in appearance, a party or privy to the endorsement.

On this point the judge who tried the cause charged the jury, " that if the plaintiffs had any knowledge that the note in question was endorsed by Teats, without the knowledge of Stall, for the benefit of another person, they could not recover; but that the plaintiffs being the holders of the note as negotiable paper, were entitled to recover against the defendant Stall, if they received the note in good faith, without knowledge that Stall had not assented to the endorsement, although it was endorsed by one of the partners in the name of the firm, without his knowledge or assent, and for the accommodation and benefit of the drawer." To this charge an exception was taken, and was urged on the argument on the ground that the endorsement of the name of the firm being established to be an accommodation endorsement, it was not necessary for the defendant at the trial to show that the plaintiffs knew that it was made by another member of the firm without the defendant's knowledge; it being sufficient to show that the plaintiffs had reason to know that it was an accommodation endorsement, [481] which fact of itself would throw upon them the necessity of proving that the defendant was an assenting party to the endorsement.

Now, though the evidence of Hill, the cashier, might be deemed sufficient to satisfy the jury that the plaintiffs did not suppose that they were dealing with the drawer of the note, and therefore, that they had no reason to regard the en-

Still v. The Catskill Bank.

dorsement as having been made merely for his accommodation, yet as there were circumstances to warrant a contrary conclusion, the judge's charge that *the plaintiffs must have knowledge* that the endorsement was made without the knowledge of the defendant Stall, was misleading the jury from an inquiry into that fact, which the supreme court has decided, in several instances, to be the *controlling fact* in cases of this nature.

In the *Bank of Rochester* v. *Bowen*, (7 *Wendell*, 158,) it was held that to charge all the members of a firm, where a note is signed in the name of the firm for the benefit of a third person, also a party to the note, the bank which had discounted such note, knowing it to be for the benefit of the third person, was bound to show that all the members of the firm had assented to the execution of the note. The court say expressly, that the knowledge that the note was negotiated for the benefit of (Bowen) the third person, was " sufficient to repel the *prima facie* inference that the firm of Aldrich & Searle were interested in the loan, or that Searle consented to become security for the same." This principle was also maintained in *Boyd* v. *Plumb*, (7 *Wendell*, 309,) and again in *Joyce* v. *Williams*, (14 *id*. 141,) and *Wilson* v. *Williams*, (*id*. 146.) If, therefore, these decisions shall be regarded as establishing the true principle of the effect of an endorsement, or a signature of the name of a partnership firm, there would be, I think, great reason for saying that the circuit judge misdirected the jury by proposing for their inquiry the fact whether the plaintiffs *knew* " that the note in question was endorsed by Teats, *without the knowledge of Stall*, for the benefit of another person." But believing, as much reflection on the subject compels me [482] to do, that the supreme court has in some degree departed from the true principle of the effect of a partnership signature, I am satisfied that the judge's charge in this respect was not erroneous.

It would be unnecessary to discuss the general principles and objects of partnerships, to show that the *power of* one partner to bind another, must, for the purposes of trade, be very great, or the moral fitness in case of an abuse of trust by one partner, of making a copartner who lends his own character to give credit and confidence to an unworthy associate, bear the loss rather than an innocent stranger. On the other hand, it is not to be denied that justice and public policy require there should be limits to the power of one partner to bind his copartner, and especially that this power, which for all reasons must be large, should not become an instrument for subserving the fraudulent designs of other persons. It needs no argument to show how unreasonable it would be when the law, at the expense of an ignorant partner, protects a third person, who through his copartner has given credit to the firm, that it should also carefully protect such partner against any fraudulent collusion between such third person and his copartner; and that in this consists the whole object of the law in its distinctions between what is and what is not a partnership liability, will, I think, be ascertained very clearly, both from principle and authority. The discrepancy between the English decisions and our own, arises not from any difference of opinion as to the object, but a difference as to the means of reaching the object. Thus, in *Gansevoort* v. *Williams*, (14 *Wendell*, 139,) the court, in speaking of the effect of the signature of a firm by one member of it, says: " There appears never to have been a doubt in England or in this state in any of the cases, but that all the partners are bound unless the *bona fides* can be impeached." Assuming it, then, to be the true principle, that the signature by one partner of the name of the partnership firm binds all the copartners to persons giving credit to the name of the firm, unless it appear that such credit was given *mala fide*, the question then arises, what shall be deemed presumptive or sufficient evidence of such *mala fides*? It is on this question that the supreme court has confessedly de- [483] parted from the rule of the English courts; and has also, I think, in its later decisions, manifestly gone beyond the rule laid down by itself when

Stall v. The Catskill Bank.

it first departed from the English rule, and is now upon ground inconsistent with the convenience and security of a commercial community.

The case of *Ridley* v. *Taylor*, (13 *East*, 175,) was where a partner drew a bill in the partnership name to pay his individual debt, and the question was whether the creditor taking the bill was to be presumed to know that it was given covinously without the knowledge of the other partner. The court decided, that in the absence of proof of such covin it could not be presumed. This decision, perhaps, is not irreconcileable with that in *Livingston* v. *Hastie*, (2 *Caines*, 246,) made at an earlier day, for it is not clear, from the statement of this case, but that the party taking the note did know that it was given without the knowledge or consent of the other copartner. The court, putting its decision on the principle that where a person " takes a partnership note from one of the company for what he knows to be his particular debt, *without consulting or apprising* the other members of his intention, or obtaining their consent, there is no hardship in confining his remedy to the one whose debt it was." The cases of *Lansing* v. *Gaine and Ten Eyck*, (2 *Johns. R.* 300) ; *Livingston* v. *Roosevelt*, (4 *id.* 251,) and *Dubois* v. *Roosevelt*, reported in a note to the latter case, involve different principles and are not so distinct on the point in question. The case of *Dob.* v. *Halsey*, (16 *Johns. R.* 34,) was where a person having an individual debt against a partner, received in payment the property which he knew to belong to the partnership. It is stated by the court, that the facts showed that the creditor " had every reason to believe that the other partners, had they been informed of the sale of the timber to pay Moore's private debt, would have objected to it." The case, however, shows, that the court recognizes a distinction between its own rule and that of the king's bench, which it states in the following words : " The only difference between the decision of the supreme court and that of the king's bench consists in this : we require the separate creditor, who has obtained the partnership paper for the private debt of one of the partners, to show the assent of the [484] whole firm to be bound ; the rule of the king's bench throws the burden of avoiding such security on the firm, by requiring them to prove that the act was covinous on the part of the partner for whose private debt the paper of the firm was given, by showing that it was done without the knowledge and against the consent of the other partners and that the fact was known to the creditor when he took the paper of the firm." Admitting, as I am not indisposed to do, that the rule of the supreme court, as here presented, is preferable to that of the king's bench, it may be well to pause and inquire what the rule of the supreme court is, and in what circumstances the good sense of it is founded. The rule is, that where a separate creditor has obtained of one partner the partnership paper for his individual debt, he shall not hold the other partners unless he show their assent to the transaction. Now undoubtedly the only reason to warrant the court, without direct proof, to infer fraud in the creditor, contrary to the general principle to which the English court adheres, that fraud must be proved and will not be implied, is, that it being the precedent debt of one partner, which the other partners could have no possible motive for assuming, the creditor taking the partnership security from that partner shall be presumed to know that the other partners would have objected had they known of the transaction. When, therefore, the supreme court in *Foot* v. *Sabin*, (19 *Johns. R.* 154,) say, that " the same principle applies with greater force when *one of the partners becomes security for another person*, and attempts to bind his copartners, it is necessary to look carefully and see to what state of facts it is that this principle applies with greater force. If in this case the creditor who took the security for a debt due to him from a third person, knew that the name of the partnership firm was signed by one of the partners without the knowledge or consent of his copartner, and *without any beneficial inducement* to the firm for assuming the liability, then the principle stated in *Dob* v. *Halsey* might apply, not with greater, but perhaps with equal force. But without affirmative proof to this

[485]   effect, it would not be as just or reasonable to infer covin or *mala fides* on the part of the creditor in the one case as in the other. In the case first put, the creditor knows that the name of the partnership is signed by the partner who owes him the separate debt, he knows that there is no apparent inducement for the other partner to make himself liable for it, while there is a natural inducement for the debtor partner to charge his own liability upon the partnership. How conclusive these circumstances should be deemed, in raising a presumption of collusion against the creditor, it is not necessary here to examine, it being sufficient that they are the circumstances, and the only circumstances, upon which the presumption is established—and which presumption alone distinguishes our rule from the English rule, and takes the case out of the general principle that the act of one partner binds his copartner. But in the other case, the creditor of a third person who receives a partnership security for his debt, may not know which partner signs the security, or that it is not the act of all the partners. There is not, on the face of the transaction, an apparent inducement for one partner to sign in fraud of his copartner—or even a presumption that all the partners have not the same and a sufficient inducement for giving the security. With great deference, therefore, to the distinguished judge who pronounced the decision in *Foot* v. *Sabin*, I must dissent from his opinion that a partnership security for the debt of a third person rests on the same principle as a partnership security given by one partner to pay his own precedent individual debt.

But the decision in the *Bank of Rochester* v. *Bowen and others*, (7 *Wendell*, 158,) though perhaps warranted, or at least naturally induced by what was said by the court in *Foot* v. *Sabin*, carries the principle at least one step further; for this is not the case of security for a precedent debt, but one where the original credit was given on the faith of the partnership name, and though it was known that the money was obtained for the benefit of a third person, yet it was not known that the partnership name was used without the knowledge or consent [486] of all the partners, nor was the fact attempted to be proved. The case is decided on the simple principle that the note appearing to be for the benefit of a third person, the signature of the name of the firm was not *prima facie* the signature of the firm, but only of the particular partner who executed it. The cases of *Joyce* v. *Williams*, (14 *Wendell*, 141,) and *Wilson* v. *Williams*, (*id.* 146,) perhaps do not go further, if indeed it be possible for any case to go further than that of the *Bank of Rochester* v. *Bowen.* They however apply the principle, to its fullest extent, to a new description of credits. Both are cases where a partnership security was obtained for goods sold to a third person in the ordinary course of trade, and wholly upon the faith of such security. The good faith of the seller is not proposed to be impeached, and both cases rest on the naked ground that the seller knew that the security was not given for property sold to the firm, but for property sold to a third person. In these cases, it appears to me that the supreme court has manifestly departed from its original position taken in *Livingston* v. *Hastie* and *Dob* v. *Halsey.* In the first of these last named cases, the decision turns on the point that the creditor took the note from the debtor partner without consulting or apprising the other partners of his intention; and in the other case, the creditor knew that he was taking of his debtor, in payment of his debt, the partnership property, not only without the knowledge of the other partners, but under circumstances that gave him " every reason to believe that the other partners, had they been informed of the sale, would have objected to it ;" and both cases are decided on the ground that the facts established, presumptively, covin or collusion between the debtor partner and his creditor. It is fraud on the part of the creditor, which alone constitutes the defence of the unparticipating partner ; and though the supreme court differed from the king's bench as to what should be deemed sufficient evidence of fraud, it was not until the two latter decisions that it was ever doubted that the fraud of the creditor must be shown in some way. Even

Stall *v.* The Catskill Bank.

in *Gansevoort* v. *Williams*, (14 *Wendell*, 133,) which is contemporaneous with the latest decisions on this point, the court admits that the principle why the creditor should not recover, is, that he has been "guilty of con- [487] curring in an attempt at fraud upon the other partners." And in answering its own inquiry, "why should the partners be bound at all, when the paper is in fact signed without their authority?" the court says, very truly, "By entering into the partnership, each reposes confidence in the other, and constitutes him a general agent as to all the partnership concerns; and the inconveniences to commerce if it were necessary that the actual consent of each partner should be obtained, or that it should be ascertained that the transaction was for the benefit of the firm in their ordinary business, suggested the rule that the act of one, when it has the appearance of being on behalf of the firm, is considered the act of all." And the court adds, "there appears never to have been a doubt in England, or in this state, in any of the cases, but that all the partners are bound, unless the *bona fides* can be impeached." And yet the two cases of *Joice* v. *Williams* and *Wilson* v. *Williams*, reported in the same volume, and in direct juxtaposition with the foregoing case, are decided. I humbly apprehend, in direct contradiction to the indisputable just doctrines which that case in this respect presents. In these cases the actual *bona fides* of the person giving the credit is not impeached by any circumstances showing collusion with one of the partners to defraud the other; on the contrary, the possibility of such collusion is refuted by evidence that he had no intercourse with either partner, and by the absence of all motive for colluding with either. There was no proof or presumption of knowledge that the security was not given with the assent of both partners, or that it was not given for a sufficient partnership inducement—no knowledge which partner executed the writing, and no other knowledge that it was executed by one alone, than the necessity of its being so executed imposed. Add to this, he had given a consideration for the signature of the firm which he would not have given for the signature of a single member of it. Under these circumstances the court, in the latter of these two cases, is so pressed both by the want of proof of the plaintiff's *mala fides*, and by clear affirmative proof of his actual *bona fides* in the transaction, [488] that it is compelled to change its whole ground, and say that "it is not a question of *fraud* but of *contract*," and that "good faith on the part of the plaintiff cannot subject a person who has never dealt with him to any liability." It cannot, I think, require argument to show that this conclusion sustains the position which I have before stated, that the supreme court, "in its later decisions, has manifestly gone beyond the rule laid down by itself when it first departed from the English rule." And to sustain my other position, that "it is now upon ground inconsistent with the convenience and security of a commercial community." I might cite, not only its own language in the contemporaneous case of *Gansevoort* v. *Williams*, but hundreds of other authorities both in the American and English courts. But not to encumber the argument with decisions, and to present it in an aspect which I think must enforce conviction, it seems only necessary to add, that if it be not a question of fraud, but a question of contract, whether one partner is liable upon the signature of the firm made by his copartner, then the rule heretofore supposed to be universal, that "the act of one partner, when it has the appearance of being in behalf of the firm, is to be considered the act of all," is reversed; and by logical deduction it should follow, 1. that the signature of the name of the firm, as to partners not consenting, is a forgery, as much as though their individual names at full length had been used without their knowledge or consent; 2. that the knowledge of the person receiving the security that it was given as security, is immaterial, for if the question is one of contract, the fact that it was given as security is sufficient to protect the partner who did not actually consent; and 3. that the contract on principle is no more available in the hands of an innocent transferree than in the hands of the original holder—for if the non-acting partner was never in fact a party to the contract, no negotiation of it can make him one. Being

therefore compelled to disagree to this doctrine of the supreme court, I necessarily conclude that the circuit judge was correct in charging the jury to inquire [489] whether " the plaintiffs had any knowledge that the note in question was endorsed by Teats, without the knowledge of Stall, for the benefit of another person."

The objection that Hill, the cashier, was not a competent witness for the plaintiffs, I am satisfied cannot be sustained. It certainly is very suspicious, that a stockholder in a company which is a party on the record, should assign his stock immediately before the trial, for the sole purpose of enabling himself to be a witness, and under circumstances to warrant the presumption that he expected to receive and would receive a re-transfer of it directly after the trial was over; but still, it is not easy to distinguish the case from many cases where a release is executed the moment a witness is about to be sworn, and where the subsequent competency of the witness is unquestioned. It cannot be denied that in a strict legal sense, he ceased to have an interest in the event of the suit when he ceased to be a party to it, which was as soon as he had divested himself of his stock. Such circumstances should doubtless weigh heavily against the credibility of a witness; but it is not possible to regard them as determining his incompetency, without subverting principles of the law of evidence, which are firmly, and I doubt not, wisely fixed. But in the present case, a circumstance appears, that seems to have been overlooked on the argument by the counsel on both sides, which seems to remove all just objection to the witness, even on the score of credibility. It appears that when the defendants put him on his *voir dire*, and when, of course for this purpose, he is to be regarded as the defendants' witness, he " swore that he had no interest in the suit, and that it would make no difference to the plaintiffs whether they recovered or not, as they were fully indemnified." His interest, therefore, though he had continued to be a stockholder, was rather technical than operative; and this technical interest was, to say the least of it, technically divested by the sale of the stock.

In respect to the sufficiency of notice of the dishonor of the note, I agree with the supreme court that " we must consider and decide the case as if the endorsement of the firm had been made in pursuance of proper authority, and [490] the defendants are legally liable, upon due notice, the same as if the note had been made in the regular business of the concern." But I confess, that even in this view of the case, I should not have been entirely satisfied on the trial that the notice was sufficient. Still, as the question is in a measure one of fact as well as of law, and regarding the testimony of Mr. Hill, the cashier, as entitled to full weight, I am not clear that the judge's charge was in this respect so materially erroneous, as to be willing to reverse the judgment on this account. I shall vote, therefore, for its affirmance.

Whereupon the judgment of the supreme court was *unanimously* AFFIRMED.