Priest *v.* Cummings.

---

### PRIEST and others *vs.* CUMMINGS.

The *widow* of a natural born citizen who was an *alien* when the act passed in 1802, *enabling aliens to purchase and hold real estate,* is not entitled to dower under the provisions of that act, where the lands in which dower is claimed were acquired by the husband, and the marriage took place *previous to the passage of the act.*

A *feme covert* who is *an alien* may be naturalized; but her naturalization has not, under the general acts of congress, a retroactive operation, so as to entitle her to dower in lands of which her husband was seised during coverture, and which he had aliened previous to her naturalization.

A *feme covert* is not barred of her right of dower by joining with her husband in the conveyance of lands, and *acknowledging* her execution of the deed before an officer authorized to take the acknowledgment of deeds, if at the time of such acknowledgment, she be a *minor* within the age of twenty-one.

It *seems,* that such *feme covert* need not do any act *disaffirming* such convey nce before suit brought for the recovery of dower.*

ERROR from the supreme court. Catherine Cummings brought her action in the superior court of law of the city of New-York

---

* The *Chancellor,* in commenting upon the case of *Sutliff* v. *Forgey,* 1 *Cowen,* 89, and 5 *id.* 715, *S. C. in error,* where the *alien widow* of a *naturalized citizen* was

Priest *v.* Cummings.

against Luke Kip, to recover, as the widow of James Cummings, her dower in certain lots in the city of New-York. In 1796, the lots in question were conveyed to her husband ; on the 29th of January, 1802, the plaintiff was married to James Cummings, a natural born citizen, with whom she lived in the city of New-York until his death, in 1832 ; at the commencement of this suit, the defendant was in possession of the premises in question under title derived from the husband of the plaintiff, by virtue of the foreclosure of a mortgage executed by him to one *James Foster,* bearing date the 4th June, 1802. The mortgage was foreclosed in chancery, the decree ordering a sale of the mortgaged premises was made on the 10th April, 1804, the premises

permitted to recover dower in lands *purchased* by the husband, and *conveyed* to him *during the coverture,* expresses the opinion that the decision in that case was made upon the ground that the widow was at the time of the purchase by the husband *capable* under the enabling act of 1802, *of purchasing and holding real estate,* and that *by the same conveyance* under which her husband took, and *at the same moment* when he became seised, she became a *purchaser* within the meaning of the act, of an inchoate right of dower; and that had the lands in the principal case been acquired *subsequent* to the act of 1802, whilst the plaintiff was *an alien,* and had she possessed at the time a legal capacity under the enabling act to purchase and hold real estate, that she would by the purchase of her husband have acquired an i choate right of dower, which on the decease of her husband would have become absolute.

*Senator* VERPLANCK concurs with the chancellor in his view of the case of *Sutliff* v. *Forgey ;* and upon the principal question holds that a woman, *an alien* at the time of her marriage, is not entitled, under the act enabling aliens to purchase and hold real estate, to claim dower in lands whereof her husband, a natural born citizen, *was seised before her marriage,* because : 1. title by *dower* is *by act* or *operation of law* and not *by purchase ;* and 2. because the word *purchase,* as found in the enabling statutes, is not used in its technical sense as indicating one of the two modes in which only it is said that title to real property can be acquired, i. e. by *descent* or *purchase,* but that it is used in its ordinary and generally received sense, signifying the *buying* of land.

In respect to the effect of the *naturalization* of the plaintiff, *Senator* VERPLANCK concurs with the chancellor in the conclusion at which he arrived, as stated above— he holds that from the phraseology of the naturalization laws themselves, as well as from other considerations, the effect of a *naturalization* here is the same as that of a *denization* in England, i. e. that it is not *retroactive* but *prospective ;* that the *feme* becomes entitled to dower out of all the lands whereof her husband was seised *at the time of her naturalization,* but not out of lands whereof her husband had been *previously* seised and which *before* her naturalization he had aliened.

*Senator* WAGER delivered an opinion for an *affirmance* of the judgment in the courts below upon the principle of *stare decisis;* he considering the decision in the case of *Sutliff* v. *Forgey* as controlling this case.

were sold at public auction, and bid in by William H. Robinson, to whom the same were conveyed by a master's deed on the 1st June, 1804. The plaintiff was not a *party* to the suit in chancery. On the part of the defendant, it was shown that the plaintiff joined with her husband in executing the mortgage to Foster, and, on the day of its date, *acknowledged* her execution thereof before a master in chancery, who endorsed upon the mortgage a certificate of such acknowledgment; and also that she was *born* a subject of the king of Great Britain. To rebut this proof, it was shown that, at the date of the mortgage to Foster, the plaintiff was a *minor* within the age of twenty-one years, to wit, of the age of about nineteen years and six months, and a certificate of a court of record was produced that, on the 16th October, 1829, the plaintiff became a citizen of the United States in conformity to the acts of congress, prescribing the mode of *naturalization of aliens.* The defendant attempted to invalidate the proceedings in respect to the naturalization of the plaintiff, on the ground of irregularity; but as the objection is not noticed in the opinions delivered in this court, it is not here stated. The jury, under the charge of the court, found a verdict for the plaintiff, upon which judgment was rendered. The defendant having excepted to various decisions, sued out a writ of error removing the record into the supreme court. Kip, the plaintiff in error, having died, an order was made directing the cause to proceed at the suit of his heirs at law, the present plaintiffs in error. The supreme court *affirmed* the judgment of the court below. See opinion delivered by *Chief Justice* NELSON, 16 *Wendell,* 619, *et seq.* The defendants then removed the record into this court, where the cause was argued by

*D. Selden & B. H. Butler,* for the plaintiffs in error.

*S. Sherwood,* for the defendant in error.

*Points for the plaintiffs in error :*
I. The widow is not entitled to dower by virtue of the enabling statutes in respect to aliens; because,

Priest *v.* Cummings.

1. Her husband was a natural born citizen of the United States, and purchased the lands in question in 1796, long before the first statute in the series was passed. The purchase therefore was not made by him by virtue of the enabling statutes, nor is the wife, within their equity or spirit, entitled to the benefit thereof, especially as she was married before the enactment of either of those statutes. *Mick* v. *Mick*, 10 *Wendell*, 379. 12 *id.* 66. 4 *Kent's Comm.* 36, 37. 1 *R. S.* 740, § 2. 3 *id. App.* 596, § 2, 2d ed. *Jackson, ex dem. People*, v. *Etz*, 5 *Cowen*, 314. *Goodell* v. *Jackson*, 20 *Johns. R.* 703. 5 *Johns. Ch. R.* 239. *Jackson, ex dem. Woodruff* v. *Gilchrist*, 15 *Johns. R.* 116. *Buchanan* v. *Deshon*, 1 *Har. & Gill*, 280. 3 *R. S.* 343, 344. *McCartee* v. *Orphan Asylum Society*, 9 *Cowen*, 506. *Varick* v. *Jackson*, 2 *Wendell*, 166, 204. *Berry* v. *Mutual Ins. Co.* 2 *Johns. Ch. R.* 611, 612. *Jones* v. *Morey*, 2 *Cowen*, 314, 315. *Searing* v. *Brinkerhoff*, 5 *Johns. Ch. R.* 329, 331. *Van Rensselaer* v. *Sheriff of Albany*, 1 *Cowen*, 501, *and the cases below.*

2. The defendant in error being an alien at the time of her marriage, she acquired on such marriage no inchoate right of dower, and the land in question was therefore held by her husband up to the 26th of March, 1802, free from any charge, or incumbrance by way of dower, *cases quoted*, 1 *Cowen*, 95. The enabling statute of March 26, 1802, and the subsequent acts should not be so construed as to subject lands so held, to dower, by a retrospective effect. Such was not the intention of the Legislature. *Sayre* v. *Wisner*, 8 *Wendell*, 661, 663. *United States* v. *Arredondo*, 6 *Peters' U. S. R.* 733. *City of New-Orleans* v. *Armas*, 9 *id.* 224, 236. *Jackson, ex dem. Gratz* v. *Catlin*, 2 *Johns. R.* 248, 263; 8 *id.* 520, 555, 556, *S. C. in error. Dash* v. *Van Kleek*, 7 *id.* 495, 502, 503 *to* 509. *Jackson, ex dem. McCloughry* v. *Lyon*, 9 *Cowen*, 669. *Beadleston* v. *Sprague*, 6 *Johns. R.* 101. *Gardner* v. *Trustees of Newburgh*, 2 *Johns. Ch. R.* 162, 167, 168. *Jackson, ex dem. Scofield* v. *Collins*, 3 *Cowen*, 89, 95. *Jackson, ex dem. Cooper* v. *Cory*, 8 *Johns. R.* 385. *People* v. *Platt*, 17 *id.* 195, 215, 216. 10 *Wendell*, 447. 7 *id.* 334. *Co. Litt. n.* 187. 2 *Black Comm.*

251. 3 *Johns. Cas.* 113. 12 *Petersd. Ab.* 512, 735. 1 *id.* 323, *tit. Aliens.* *Co. Litt.* 18, *b.* 10 *Johns. R.* 232, *and the above authorities.*

3. As all persons are chargeable with a knowledge of the law, the legal presumption is, that the marriage was contracted between the defendant in error and her late husband, with reference to her existing incapacity to acquire a right of dower in his lands ; whatever therefore may have been the actual intention of the Legislature, it was not in their power to pass a law varying the effect, or impairing the obligation, in this respect, of the marriage contract. *See the above authorities, and Cons. U. S., art. 1, sect. 10, § 1.*

4. The mortgage sale was made in June, 1804. Mrs. Cummings then had no inchoate right of dower in the land, and subsequent statutes could not give her such a right in respect to lands previously sold to a *bona fide* purchaser. *See the above authorities.*

5. The several considerations above stated materially distinguish this case from the case of *Sutliff* v. *Forgey;* which, therefore, even if correctly interpreted by the court below, cannot control this case. It is insisted, however, that the grounds of decision in that case, when properly understood, are in unison with the points above taken. *See case 1 Cowen, 89, and 5 id.* 713.

II. The acknowledgment of the mortgage by the wife, on her separate examination, under the statute, bars her claim to dower, though she was then under age.

1. The statute does not require that a married woman, in order to convey her interest in lands, shall be of full age. It is sufficient that having attained the age requisite to contract marriage, and having been duly married, she consents on the private examination to the execution of the conveyance. *Coates* v. *Cheever,* 1 *Cowen,* 479. *Whitbeck* v. *Cook,* 15 *Johns. R.* 490. *Demarest* v. *Wynkoop,* 3 *Johns. Ch. R.* 142, 144, 146. *Duplex* v. *De Roven,* 2 *Vern.* 540. *Jackson, ex dem. Stevens* v *Stevens,* 16 *Johns. R.* 110. 5 *Cruise,* 90. *Drury* v. *Drury, quoted* 8 *Wendell,* 20, 21, 267. *Teller* v. *McCartee,* 2 *Paige,* 520. 3 *R. S. App.* 22 *to* 30. 1 *R. L.* 369. *Also, Statute of Fines.* 3

Priest *v.* Cummings.

*R. S. App.* 3. 6 *Wendell,* 12. 7 *Mass. R.* 14, 77. 3 *Bac. Abr.* 596, *tit. Infancy and Age.* 3 *Com. Dig.* 618. 4 *id.* 306, *tit. Gavelkind.* 12 *Co.* 122. 10 *Id.* 42. *Ld. Raym.* 486. *Stra.* 735. *Plowd.* 369, 370. 5 *Cruise,* 215, 217. 6 *Jac. Law Dict.* 208. 5 *Bro. Par. Cas.* 57.

2. The above principle, if for any reason inapplicable to a conveyance of lands *belonging* to the infant wife, applies in reason, and by analogy, to the relinquishment of her right of dower in her husband's estate, which is but an incident to the marriage contract ; when competent in law to contract marriage she must be regarded as equally competent to this collateral contract, provided the statute formalities be complied with. *See the above authorities.*

3. The statutory examination having been provided in lieu of the common law assurances by fine and common recovery, the infant wife will be barred unless, as in those cases, she disaffirms it during her infancy. *The same authorities as last above and next below.*

4. At all events, the conveyance being merely voidable, it was the duty of Mrs. Cummings, on her coming of age, to disaffirm it within a reasonable time. Her coverture, at that time and subsequently, is no excuse for her omission, and after the lapse of nearly thirty years, and an adverse possession of more than twenty-five, she cannot now be permitted to avoid her conveyance on the ground of infancy. *See* 2 *Kent's Comm. Lect.* 31, *and authorities there quoted. Demarest* v. *Wynkoop,* 3 *Johns. Ch. R.* 144. 17 *Wendell,* 119.

III. The naturalization of the defendant in error can have no retrospective effect to entitle her to dower as against previous *bona fide* purchasers. *Cases cited by Ch. J. Nelson, in his opinion in this case. Collingwood* v. *Pace,* 1 *Ventr.* 417. *Fish* v. *Klein,* 2 *Meriv.* 431. 2 *Wash. R.* 113. *Vaux* v. *Nesbit,* 1 *McCord's Ch. Cas.* 352, 372. 2 *Chit. Com. Law,* 325, 326, 337. 2 *Greenl. Laws,* 280. 3 *R. S. App.* 21. 1 *Kep.* 174. 2 *Johns. Cas.* 33. *Bac. Abr, tit. Alien, C.* 2. *Black. Comm.* 250, &c.

*Points for the defendant in error :*

I. The respondent is entitled to her dower, notwithstanding her having been an alien. *Const. U. S.* § 8. *Act of Cong. April* 14, 1802. *Ing. Abr.* 434. 6 *Cranch*, 176. 7 *id.* 420. 1 *Johns. Cas.* 399. 2 *Kent's Comm.* 57. 7 *Wendell*, 334. 12 *id.* 343. 1 *Black. Comm.* 374. 1 *Petersdorf*, 323, *tit. Alien. Godfrey* v. *Dixon, Cro. Jac.* 539. 2 *Viner's Abr.* 270, *tit. Alien.* 2 *Black. Comm.* 249, 250. 1 *Co. Litt.* 129, *a, tit. Villenage. Clan. Treat. on Rights of Woman*, 202. *Co. Litt.* 33, *b.* 1 *Cruise's Dig. tit. Dower IV.*, *ch.* 2, § 26, 32. 9 *Viner's Abr.* 212, *tit. Dower.*

1. She was *duly naturalized* under the laws of the United States, on the 16th October, 1829, during the life of her husband, and such naturalization removes all disabilities, and her rights attach retrospectively from the period of her marriage.

2. The record of naturalization is sufficient, notwithstanding the omission in the record of the words, "and within the state of New-York," which were inserted in the original affidavit between the words " New-York" and " one."

3. And notwithstanding that one of the witnesses testifying upon the naturalization, is alleged to have been the husband of Mrs. Cummings. *Campbell* v. *Gordon and wife*, 6 *Cranch*, 176. *Starke* v. *Chesapeake Ins. Co.* 7 *id.* 420. *Spratt* v. *Small*, 4 *Peters*, 393. *Shenk* v. *Dupont*, 3 *id.* 248. 1 *Johns. Cas.* 29. 3 *id.* 109.

4. She is entitled to her dower under the enabling statutes of 1802 and 1808. 3 *R. S.* 342, 343. *Sutliff* v. *Forgey*, 1 *Cowen*, 90. 5 *id.* 113. *Mick* v. *Mick*, 10 *Wendell*, 379. *Co. Litt.* 12. *James* v. *Morey*, 2 *Cowen*, 290. 2 *Black. Comm.* 241. *Whelan* v. *Whelan*, 3 *Cowen*, 579. *Sterry* v. *Arden*, 3 *Johns. Ch. R*, 261, 262, 271. 12 *Johns. R.* 236.

II. The respondent is entitled to her dower, notwithstanding the mortgage given by Mr. Cummings to James Foster, 4th June, 1802, in which Mrs. Cummings joined, for,

1. She was an infant under the age of twenty-one, when the

Priest v. Cummings.

same was executed. *Sanford* v. *McLean*, 3 *Paige*, 121. *Hearles* v. *Greensby*, 1 *Vesey, sen.* 299. *Stamper* v. *Barker*, 5 *Mad.* 157. 3 *Bac. Abr.* 596, *tit. Inf. and Age.* 7 *Cowen*, 180.

2. Her acknowledgment apart from her husband, while an infant, did not give validity to her act. 4 *Johns. R.* 161. 12 *id.* 469. *Preston on Conv.* 252. 12 *Co.* 122. 5 *Cruise's Dig. tit. Fine, ch.* 5, § 26, 27, 28.

3. Her rights are not barred by the foreclosure ; for as against her the mortgage has not been foreclosed, she not being a party.

After advisement, the following opinions were delivered :

By the CHANCELLOR. I have no doubt upon the question, as to the regularity and validity of the naturalization of the defendant in error in 1829. The fact that she was then a feme covert was no objection, as neither married women or infants are excluded from the benefit of the acts of congress on this subject. The fact that the statute makes the naturalization of the father, in certaian cases, enure to the benefit of his infant children, does not preclude infants themselves from applying whenever it may be necessary ; and as the general language of the naturalization acts include all free white persons, femes covert and infants if they have sufficient capacity to understand their rights and the nature and obligation of an oath, may be naturalized.

I cannot admit, however, that the effect of naturalization under the general acts of congress, which have not declared what shall be the effect of such naturalization, can retroact so as to divest rights which have been acquired by others previous to such naturalization. It is said by Coke, and other elementary writers, that if a man take an *alien* to wife, and afterwards aliens his land, and then the wife is made a *denizen*, and the husband afterwards dies, she shall not be endowed, because her capacity and possibility to be endowed came subsequent to the marriage by the act of denization ; but that it is otherwise where she is *naturalized* by act of parliament, *Co. Litt.* 33, *b; Clancy*, 202;

and it is supposed that the effect of a naturalization under an act of congress must necessarily have the same effect as naturalization by act of parliament. That a naturalization here has the effect to give to the naturalized citizen inheritable blood, so as to enable him to take by descent from another citizen, as well as to acquire lands by purchase, I have no doubt. It probably would also have the effect to give to the naturalized wife a capacity to take an inchoate right of dower in lands, of which the husband was seized in fee at the time of her naturalization, so as to give her the right of dower therein at his death. To that extent the husband takes his land, subject to the right of his wife to acquire a title to dower therein, by a subsequent naturalization under a law which was in existence at the time of his purchase, or marriage; and as the wife after her naturalization has an inchoate right of dower in such lands, of which she cannot be deprived except by her own consent, a subsequent purchaser from the husband who neglects to procure her release, takes the land subject to such right. But where the husband had parted with all his interest in the land before his wife had the capacity to take even an inchoate interest therein, which could by any possibility be released while the wife was an alien, it would be contrary to every principle of justice and common sense to give her the right to divest or impair the title of the purchaser, by her subsequent act of naturalization. The same objections would also exist to the retroactive operation of a naturalization, where the person thus naturalized had previously been passed over in the descent of real estate, in favor of a more remote lineal or collateral heir who was not an alien. In such cases, if the principle of retroaction contended for here, should be adopted and established, the estate would to a certain extent be rendered inalienable in the hands of the owner thereof. In the first case, the possible right of the alien wife could not be extinguished by any release or common law conveyance; and in the last case, no one could safely purchase from the more remote heir, upon whom the inheritance had descended, until all the intermediate alien heirs and their descendants, who were in existence at the time of the

descent cast, were dead, as it could not until then be known to the purchaser whether any, and if any, which of them would become naturalized.

The effect of a statutory naturalization in England, in over-reaching previous vested rights, depends upon the omnipotence which has been ascribed to an act of parliment; in which at some of the earlier periods of English history, a due regard was not always paid to the rights of third persons who had not petitioned for the passing of the act. These private acts of naturalization are seldom found in the printed collections of English statutes; but by a reference to one which is published by Mr. Chitty as the common form of such acts, 2 *Chit. Com. Law. App.* 325, it will be seen that the nature and extent of the rights acquired under it, are declared in the act itself, and that the language is very strong to show the intention of the law makers to give it a retrospective operation, not only as to inheritable blood, but also to place the person naturalized in the same situation, both actually and *constructively*, as if he had been a natural born citizen at the moment of his birth. To show that by the common law a mere parliamentary act of naturalization did not necessarily retrospect, without reference to the terms of the act, it is only necessary to refer to the opinion of Lord Hale, in the great case of *Collingwood* v. *Pace*, 1 *Vent. R.* 419. He says : " Touching the retrospect of a naturalization, and whether the eldest son, being an alien, naturalized after the death of the father, shall direct the descent to the youngest, depends upon the words of the naturalization, which being by act of parliament, may by a strange retrospect direct it. But as the naturalization in the case in question is penned, it would not do it ; the naturalization hath only respect to what shall be *hereafter.*" I conclude, therefore, that the naturalization of the defendant in error had the same effect as to the rights of property as letters of *denization* had by the common law, and the same effect as to all other rights that an act of parliament giving her all the rights of a natural born subject, and without any special provisions to give it a retrospective operation. She therefore had from that time the capacity to take an estate in dower, of and in any lands

of which the husband was then seized of an inheritable estate ; to take lands by devise or descent from any person capable of conveying or transmitting lands in that manner to her ; and to take any other interest in real estate by gift or otherwise to herself, and to sell, alienate or bequeath the same, or transmit the same to such of her heirs as were capable of taking by descent, as fully as a natural born citizen might do, but not otherwise. Her naturalization, however, did not retrospect so as to deprive the mortgagees of her husband, or those claiming under them, of any right or interest in his lands which they had acquired previous to her naturalization. I shall therefore proceed to consider the question whether she had acquired any inchoate right of dower, under the enabling statute of 1802, which could enable her to demand dower in the premises after the death of her husband, notwithstanding the mortgages and the foreclosure thereof in 1806.

I may as well observe here, that I have no doubt as to the invalidity of the objection of the plaintiffs in error, that the demandant had barred herself of any claim to dower by the execution and acknowledgment of the mortgage, in conjunction with her husband, while she was still a minor ; or at least, that she should have done some act to disaffirm the conveyance before she brought her suit. There is no pretence that the custom of gavelkind ever applied to any of the lands in this state. It is true, that that custom extended to most of the lands in the county of Kent, and to all which were originally of soccage tenures, except such as had subsequently been disgavelled by the statute, 31 *Hen.* 8, *ch.* 3, and other private statutes. But the custom did not apply to lands in that county originally held by military tenures, which tenures, by the statute 12 *Charles* 2, *ch.* 24, were converted into tenures by free and common soccage. The manor of East Greenwich, in the county of Kent, was either originally held by the tenure of knight service, or it must have been disgavelled previous to the grant of the province of New-York, to James, Duke of York, as no traces of the custom of gavelkind, except such as were common to other soccage tenures, existed in this colony previous to the revolution. Having once deliberately

examined the question, and come to the conclusion that an *infant feme covert* cannot convey an interest in lands by mere acknowledgment of the deed before a judge or commissioner, it is only necessary for me to say that I have not heard any thing on the argument of this case to induce me to doubt as to the correctness of the decision of the supreme court upon that point, which is in accordance with the decision in the case above referred to of *Sanford* v. *McLean*, 3 *Paige's R.* 121.

It is evident from the language of Chief Justice Nelson, who delivered the opinion of the supreme court in this case, that the justices of that court doubted whether the case came within the provisions of the act of 1802, if that act was properly construed; and that they would probably have given a different judgment if they had not supposed it impossible to distinguish this case from that of *Sutliff* v. *Forgey* decided by their predecessors in that court, and subsequently affirmed upon a writ of error here. I think, however, there is a manifest difference between the two cases, arising from the fact that the land in the case under consideration was held by the husband at the time of the passage of the act, and also at the time of his marriage with the defendant in error, and that in the other it was acquired afterwards. And in coming to this conclusion, I take it for granted, that the decision in the case of *Sutliff* v. *Forgey* must have proceeded upon the ground that the wife was entitled to her dower in lands acquired by her husband after the act of 1802, in the character of purchaser. The word *purchase*, in common parlance, has a much more restricted meaning than in its legal or technical sense, according to the common law, when applied to the acquisition of an estate or interest in land. According to the doctrine of the feudists, interests in land were divided into but two kinds, *feuda antiqua* and *feuda nova*, which are defined to be those to which the possessor succeeds as heir to his ancestor, and those which he has acquired in some other way. 1 *Sanf. on Herit. Suc.* 30 ; *Beame's Glanv.* 143. In the first case, the possessor is seized of the land by descent, but in the latter by conquest, *perquisitio*, or purchase. Where an estate comes to a man from his ancestor without writing, that is a descent ; but

when a person takes any thing from an ancestor or others, by deed, will, or gift, and not as heir at law, that is a purchase. 2 *Lilly's Abr.* 497 ; *Toml. Law Dict. Art. Purchase; Bell's Law Dict. Art. Conquest.* The estate of the wife as tenant in dower, is but a continuance of the estate of the husband, so that if he acquires land by purchase, or other conveyance to himself, she, by virtue of the same purchase, if then of legal capacity to take an inchoate right of dower, takes it as purchaser by the same conveyance, in the same manner as if he had taken a conveyance to himself and limited a remainder in one-third of the premises to his wife for life, in case she survived him. Such was unquestionably the opinion of Senator Colden in this court, in the case of *Sutliff v. Forgey.* He says there is no other question in the case than whether when the husband took the conveyance in 1804, he being then a naturalized citizen, and his wife an alien, she did not acquire a right of dower by purchase, so that she may hold the same under the act of 1802, notwithstanding her alienism ; and he concludes that her inchoate right of dower vested at the moment of the husband's purchase, and that she took it as purchaser, and not by descent. The first section of the act declares that all purchasers of land made or to be made by any aliens who have come to this state and become inhabitants thereof, shall be deemed valid to vest the estate to them granted, &c. If the wife is, therefore, considered a purchaser of her inchoate right of dower by the act of purchase by the husband and at the same moment, the fact that he was naturalized before the purchase did not prevent the inchoate right of the wife from vesting in her, as purchaser of such inchoate right of dower, by the provisions of the act. But in the case under consideration, the wife of Cummings had not purchased an inchoate right of dower in the lands of her husband before the act, because at the time of her marriage and until the passing of the act, she had not the capacity to acquire any interest in lands by mere operation of law, as an incident to a purchase by the husband, and the lands in question were not purchased by him after her disability was removed, but on the contrary, were purchased long

Priest *v.* Cummings.

before the marriage. She was not, therefore, a purchaser of an inchoate right of dower in these lands, either before or after the act of 1802, within the letter or the spirit of that act; and the title of the husband having been absolutely vested in a *bona fide* purchaser by virtue of the master's sale, long before her naturalization, she cannot divest that title to the prejudice of him or of his grantees. For these reasons, I think the judgments of the courts below erroneous, and that they ought to be reversed.

By Senator VERPLANCK. This case has been learnedly argued upon various points. One of the most important questions which has been raised, is on the effect of an acknowledgment according to the forms of our statute by an infant wife, upon her right of dower. This, in our State, must be a question of too frequent occurrence to be left in doubt, and if not clearly settled by judicial decision, should be defined as to future cases by legislative enactment. As in my view of the present case, the settlement of that question is not necessary to the decision of this cause, I shall decline entering into its examination or expressing any opinion on the subject. I also throw out of consideration the objections made to the record of naturalization, both because they are quite immaterial as to the course of reasoning and the conclusion of this opinion, and because they seem to me not entitled to any weight. On this point I concur fully with the reasons assigned by Chief Justice Nelson, in the opinion delivered by him in the supreme court.

Disembarrassing the cause of all the other points which have been taken in the argument before this court and in the opinions of the courts below, it is quite clear to me that Mrs. Cummings is not entitled to her dower: unless, 1. As an *alien* she is entitled by her marriage to dower in the lands of her husband, who was a *citizen;* or 2. Unless her subsequent naturalization has a retroactive effect not only removing present disabilities, but enabling her rights to attach retrospectively, as against third parties and *bona fide* purchasers; or 3. Unless the statutes of 26th March, 1802, with the other statutes to the same effect of 1804,

1805, 1807 and 1808, all passed subsequent to her marriage, enabling *resident aliens* to *purchase* and hold real estate, so operated upon her previously void interest in her husband's lands as to vest in her an inchoate right of dower, perfected at her husband's death, as a *purchaser* under these enabling statutes.

On the first branch of this inquiry, it is well settled here as in England, that, to use the language of Chief Baron Hale, " The law will not give the alien the benefit of either : 1. Descent ; 2. Curtesy ; 3. Dower." *Ventris,* 417. " Aliens are not capable of claiming dower." 1 *Cruise Dig.* 145, *and the cases there cited.* " A *feme covert* being an alien, was not by the common law entitled to be endowed, more than to inherit." 4 *Kent's Comm.* 36, *and the cases there cited.*

Does the naturalization of the widow in 1829 operate retrospectively, so as to attach the right of dower to lands held by her husband at the marriage and aliened *after* that period and *before* her naturalization? I concur with the supreme court, that on this branch of the case the widow cannot successfully claim her dower ; but I have come to that conclusion by a course of reasoning very different from that of the chief justice. If this question rested wholly on English authorities, and if the effect of naturalization under our general laws was precisely the same with that under the special naturalization laws of parliament, the authority of Lord Coke, *Coke Litt.* 33, *b.*, and the learned modern commentators and compilers, *Viner, Cruise* and *Park,* would be quite conclusive in favor of the retroactive effect of naturalization in regard to dower. *Cruise* thus sums up the English doctrine : " If an *alien* be *naturalized* by act of parliament, she then becomes entitled to dower out of all the lands whereof her husband was seized during coverture. In the case where a woman is created a *denizen,* she becomes entitled to dower out of all the lands whereof her husband was seized at the time when she was created a denizen, but not out of lands whereof he was seized before, and which he had aliened." 1 *Cruise Dig.* 146. I cannot agree with the chief justice that " the act of congress affords no great light to aid us in determining this point

in the case." On the contrary, it strikes me forcibly that the language of our acts of congress on this subject point out a strong distinction between the legal operation of the rights of citizenship acquired under them, and that of the naturalization conferred by a British act of parliament. In the acts of parliament, the operative words are the same with those used in the books ; I believe in all cases, certainly in all the cases where I have been able to ascertain the facts—either the more general acts in the statutes at large, or those cited in the reports. It is enacted that the party shall be *"naturalized,"* or "shall be deemed, adjudged and taken to be a *natural born subject,"* as if *born* within the kingdom. Thus in a statute, 33 *Henry,* 8, " The children of Thomas Powers and others, shall be reputed *natural born subjects."* In the statute, 7 *Anne, c.* 5, " All persons born out the ligeance of her majesty, who shall qualify themselves (&c. as therein provided) shall be deemed, adjudged and taken to be *natural born subjects* of Ireland, to all intents, constructions and purposes, as if they had been born within the said kingdom." So in the statute, 13 *George 2, c.* 5, naturalizing foreign protestants in America, it is enacted that they " shall be deemed, adjudged and taken, to be his majesty's *natural born subjects,* to all intents, purposes and constructions, as if they had been *born* within this kingdom." So again, by 2 *George* 3, 25, certain foreign officers and soldiers, who had served in America, are naturalized in the same words, " to be deemed and adjudged, as if they had been born within the realm." These seem to be the uniform operative words ; and their legal effect, as stated by all the authorities is, " that an alien is put in exactly the same state as if he had been born in the king's dominions," 2 *Black. Comm.* 374 ; or, in the language of Lord Coke, " is to all intents and purposes a natural born subject." From the very words employed, then (unless there be some restrictive condition added) every such naturalization must relate back to the time of birth of the individual. The naturalized subject is, in the eye of the English law, one native born. The courts do not and cannot look behind the act of parliament to prior disabilities. By the omnipotence

of parliament, the naturalized *alien* is to all intents a subject from his birth. This rule of interpretation, were such acts in England general, like ours, might frequently conflict with the vested rights of third persons. But as in England, every such act is either special for the individual, or limited to some small class of persons, it is to be presumed that such a result is generally avoided, either by previous evidence of the special circumstances of the case, or else by express words in the statutes saving any such rights in others.

The legal effect of *denization* in England, is not retroactive, as we have above seen. This is evidently not an arbitrary distinction, but grows out of the natural interpretation of the language used. There is nothing in the word *denizen* that has any relation to any specified time, especially to the time of birth. Denization is a new privilege conferred upon the alien, but not having, like the phrase *natural born* or *native*, any relation to the fact of birth or to its time, operates only from the date of its reception. Now the language of our acts of congress of general naturalization, differs from the special English acts in precisely the same manner, must be controlled by the same rules of legal interpretation, and of course are governed by the same distinction. They are called naturalization acts, but there are no words used putting the new citizen on the same footing as if he had been born in the United States. The operative words are, that on complying with certain conditions, the applicant " shall be admitted a citizen of the United States," or " admitted to citizenship," or " shall be admitted to become a citizen." The words " admitted," "become," and " shall be admitted to become," involve a future signification ; nor is there any thing implied in the word *citizen*, more than in that of *denizen*, having relation back to the time of birth. I cannot, therefore, but consider all the English authorities denying *retrospective* operation to acts of parliament admitting to denization, as applying to and authorizing a similar interpretation of our acts of congress " admitting aliens, on complying with certain conditions, to become citizens." Even independently of any authority bearing on this subject, the obvious interpretation of language leads

Priest *v.* Cummings.

me to the same conclusion, that the legal rights of the alien born, admitted to American citizenship, like those of the British denizen, bears date only from his political and not from his natural birth.

This view of the effect of our naturalization statutes may be in contradiction to some of the transient *dicta* of our judges, but is in strict congruity with the decisions and well settled law in our courts. It agrees with those decisions, which pronounce the admission to citizenship here to remove all previous disabilities, in regard to the taking or holding real estate, and as merely perfecting the title therein, forfeitable to the state by reason of alienism, but not actually void until inquest of office found, and so, good against all other parties. On the other hand, it guards against any interference of the newly acquired rights of the "admitted alien with those of prior *bona fide* purchasers and other third parties, such as in the present case and numerous others which might accrue from marriage, descent, &c. in this country, where such multitudes annually acquire these new rights of citizenship under our general laws. This too is in conformity with the decisions of the courts. The cases establishing these latter points have been cited and stated by the chief justice in the opinion of the supreme court in this case, and I therefore refrain from further detail on this head. My conclusion, therefore, is, that Mrs. Cummings cannot maintain her claim to dower by virtue of her naturalization, in any lands aliened by her husband before such naturalization though during her marriage, and now held by others under a title deduced from him.

It remains then only to inquire whether Mrs. Cummings' marriage in January, 1802, did not vest in her an inchoate right of dower which was confirmed or perfected by the operation of the act of March, 1802, and the subsequent acts extending it, authorizing resident aliens to purchase and hold real estate? I am quite clear that she is not within the provisions of those acts, as to the lands now claimed. As the supreme court, as well as the learned court below in which this cause originated, have placed their decision in favor of the claim of dower mainly upon

this ground, (governed by the presumed authority of a case formerly decided in the supreme court and affirmed in this court,) I shall enter somewhat more into detail than I have done on the other heads of the argument, in stating the reasons which have brought my mind to an opposite conclusion.

The statute of March 26, 1802, entitled " An act to enable aliens to purchase and hold real estate within this state, under certain restrictions," after reciting in its preamble that " whereas many good and industrious persons, being aliens, have emigrated to this state with an intention to settle and reside therein, and have *expended* the greater part of their capital in purchasing and improving real property," goes on to enact, " that all *purchases of land made* or to be made by any alien or aliens who have come to this state and become inhabitants thereof, shall be deemed valid to *vest the estates to them granted ;* and it shall and may be lawful to and for such alien or aliens to have and hold the same to his, her or their heirs and assigns forever, and to dispose of the same, any plea of alienism to the contrary notwithstanding ; *provided* that any purchase hereafter to be made by any such alien does not exceed one thousand acres." The statute of April 8, 1808, further enacts, that all persons authorized by that act or the one first cited, to acquire real estate by purchase, may also take and acquire by *devise* or *descent*. It was argued chiefly on the authority of a distinguished member of this court in former years, Senator *Colden*, in the case of *Forgey* v. *Sutliff*, 5 *Cowen*, 715, that the word *purchase* in this act does not mean merely the acquisition by bargain and sale, but should be taken in its peculiar technical common law signification, as defined by *Littleton :* " The possession of lands or tenements that a man hath by his deed or agreement, with which he cometh not by title of descent from any ancestor or cousin, but by his own deed." The general distinction of the later books is between the title acquired by act of law, as in *descent*, and that coming by the party's own act or agreement, which last is *purchase*. From these definitions it was inferred that a title by dower, coming by the act or agreement of the party, was within the technical meaning of the word purchase. But the true and precise

meaning of any technical word is to be decided by usage and authority, not by argument or inference. Now the highest authorities and the most general usage will be found expressly to exclude *dower* from the head of *purchase*, and to place it under the opposite class of titles by *act of law*. I shall content myself with two authorities, which I select because they are among the earliest and the latest ; the one from an illustrious old English judge, the other from an able American judge of our own days. It would be quite easy to fill up the chasm between them by a series of chronologically arranged authorities. Lord Chief Baron *Hale*, in his argument in the famous case of *Collingwood* v. *Pace*, speaking of the disabilities of aliens, says, " though the alien may take by *purchase* by his own covenant that which he cannot hold against the king, yet the law would not allow him to take by an *act of law;* for the law, *quæ nihil facit frustra*, will not give him an inheritance of freehold by *act of law*, for he cannot hold it, and therefore the law will not give him the benefit of either : 1. *Descent;* 2. *Curtesy;* 3. *Dower;* 4. *Guardianship.*" *Ventris*, 417. To come at once to our own times and country, passing intermediate authorities, *Johnson*, J. in *Lord Fairfax's case*, decided in the supreme court of the United States, says : " When a freehold is cast upon an alien, by *act of law*, as by *descent*, *dower*, *curtesy*, no inquest of office is necessary." 7 *Cranch*, 629. I cannot therefore doubt but that title by *dower* does not come within the technical meaning of the word *purchase;* and as neither Mrs. Cummings herself, nor her husband during her marriage, *bought* these lands, she cannot be within the meaning of the act. But if, relying on the definition of *purchase* in the books, and some hasty *dicta* of American judges, any should still contend that *dower* is an estate by *purchase*, in the common law sense, this will still not help the claim. It seems to me evident that the manner in which the word *purchase* is used in the act of 1802, shews that it is not used in its peculiar real estate sense, but in its ordinary and habitual one. " All purchases of lands made" can mean only *all lands bought*. This use of the word is not colloquial or " vulgar," (as it has been called by *Jacobs* and other compilers,) but may be found in

the written opinions of *Hardwicke* and *Kent,* and might well be used in legislative enactments. The phrase used is not the technical language of the old law. I cannot find that the words "purchases of lands made" are ever used to signify "lands acquired by purchase." *Cruise, Blackstone,* and the oldest writers whom they cite, always speak of "estates taken by purchase," "lands acquired by purchase," "estates unto which one comes by purchase." 1 *Black. Comm.* 218. 2 *id.* 243. 3 *Cruise,* 490. *Litt.* 1, 12. But on the contrary, "purchases of land made," is an ordinary phrase of lawyers and judges to signify "lands bought." The subsequent statute of 1808, in *pari materia,* has given a legislative construction to the act of 1802, by providing that "all persons authorized to acquire real estate under these acts, may also take by *devise;*" thus evidently showing that in the former act the broader sense of *purchase,* which would include *devise,* was not meant, but the more limited, natural and common one of *buying.* Besides this, the preamble of the act of 1802, above cited, speaks of the resident aliens, for whose relief it was passed, " having expended the greater part of their capital in *purchasing* and *improving* real property," and in the body of the act the estates so purchased, are spoken of as to *them granted.* This is the same principle of interpretation (though stronger in its application,) as that on which in *Twyne's* celebrated case, the statute of 27 *Eliz.* was held to apply only to *purchasers* for money or valuable consideration, in consequence of the word *paid* in one of the clauses, limiting the broader sense of the word *purchasers.* 3 *Rep.* 83. 4 *Cruise,* 382. I conclude, therefore, that Mrs. Cummings, an *alien* at the time of her marriage to a citizen, took no title to *dower* in lands previously owned by him ; that her subsequent naturalization could have no effect in vesting in her any such title in lands previously aliened by her husband ; and that the subsequent enabling acts of 1802 and 1808, did not give her any title, or enable her to claim dower in lands bought before marriage by her husband, when she herself at her marriage, was wholly unable to take any estate in lands by reason of alienism and the absence of any special statute to aid that disability.

Priest *v.* Cummings.

The supreme court, it is evident, was mainly governed in its decision by the case of *Sutliff* v. *Forgey*, in the supreme court, 1 *Cowen* 90, and affirmed in this court, 5 *Cowen*, 713. I have no desire to disturb the authority of that decision, which was settled in congruity with all the views I have taken of this case. That was the case of a resident alien widow whose husband (whether alien or naturalized seems wholly immaterial) actually *bought* lands *during marriage* and *after* the enactment of the enabling statutes. It was there held, that this purchase of lands enured to the benefit of the wife *who was at the time enabled to take a valid title in real estate*, that her dower " being an incident or legal consequence" of the acquisition of land by the husband, she was a buyer within the intent of the law—the husband's purchase being in fact *her's* to the extent of the right of dower. This certainly differs from the case before us in the most material points, and though the decision rests on a very liberal construction of the statutes, yet I doubt not that it is within their spirit and intent, and should unquestionably govern all similar cases. At the same time, it does not contradict or overthrow any of the principles or reasoning on which I found my opinion in the present case.

The chief justice has said that it is impossible to extract any different doctrine out of the case than the one which he states, i. e. " An alien widow of a naturalized husband is entitled to her dower out of lands of which he was seized, if she bring herself within the statutes of 1802 and 1808, enabling her to purchase and hold real estate at any time *during the seizin of the husband*; her right of dower, in such cases, attaches by reason of her capacity then to purchase and hold." This seems to me an extension of the doctrine far beyond what is warranted by the facts of the case, or any thing in the decision or reasoning of the judges. I find there no reference to the *seizin* of the husband as giving dower to the alien wife under the statutes. The seizin is indeed necessary to give effect to the dower ; but it is the *buying* by the husband, the *deed*, the *conveyance* to him during coverture, which is held to operate as a buying and conveying *pro tanto* for the wife ; and to be good under the statute,

in the same manner, to use an illustration of Judge Woodworth, (though in an estate inferior, both in degree and amount,) as if the conveyance had been made to the husband and wife giving the peculiar estate which the law creates in such a case, and which an alien wife, enabled by the statute, could doubtless take. " It was a purchase," in the words of Judge Woodworth, " effected through the medium of the husband." The doctrine of the supreme court in that case, then, in my understanding, is not that stated by the chief justice, but simply this : An alien widow is entitled to dower out of lands *bought* by and *conveyed* to her husband during her coverture, if she bring herself within the enabling statutes of 1802 and 1808, at the time of such buying and conveying ; her right of dower in such case attaching, as Ch. J. Savage says, when the husband made the purchase, by reason of her capacity to buy and hold real estate, and the grant and conveyance to her husband enuring so far to her benefit. To my mind, it seems to be in direct contradiction, not only to the declared policy and express language of the statute, but equally so to the decision itself in the case of *Sutliff* v. *Forgey*, and the reasoning on which Ch. J. Savage and his associates founded it, to assert that that decision can conclude the case when the lands in question were bought by a *native citizen* six years *before marriage*, and when the marriage itself took place *anterior* to the passing of the earliest enabling statutes, and when no right of dower vested at the time, or could have been by any constructive inference of law within the intent of the parties to the marriage contract. It is a leading rule of interpretation of statutes, that they are to be construed in reference to the principles of the common law ; for it is not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required. This," says Chancellor Kent, 1 *Kent's Comm.* 462, " has been the language of the courts in every age." The extension of the doctrine of *Sutliff* v. *Forgey* to the latitude in which it is stated by Ch. J. Nelson, so as to cover a case like the present, would be to effect an innovation upon the common law, by construction of statutory language, far beyond what the statute itself declares to be its own object,

Priest *v.* Cummings.

and "what the case requires." For the same reason, and upon the same principle, any judicial decision, however high in authority, establishing an obvious innovation upon the general rules of law, (whether of common law or of statutory enactment,) should be taken strictly, and not held by mere inference to cover more than is included in the facts of the particular case and the express ground upon which the court have placed their decision. It is true, that in this court, the opinion of Senator *Colden* went further, but there is no evidence that the cause was decided here on that ground alone ; nor, considering the peculiar constitution of this numerous court, can we consider the decision here in any other light than in that in which Ch. J. *Nelson* himself regards it, "as simply an affirmance of the doctrine of the supreme court," without reference to the peculiar and perhaps solitary opinion of an indvidual member.

But, in addition to these principles and reasons, there is yet another and larger view of the whole case, which I deem peculiarly appropriate to the special consideration of this court, organized as it is by our constitution, for the great conservative objects of preserving a liberal spirit of equity in our judicial administration, united with a prudent, cautious and equal legislation. This is one of the cases, frequently occurring, to which we should apply the great principle of strictly guarding against all *retroactive* effects of legislation upon the previously acquired rights of individuals, without express assent of all concerned. This is the vital and conservative principle of safe and just legislation, and it ought never to be lost sight of in the judicial interpretation of the laws. Every legislative interference with rights previously acquired under the faith of then existing laws, however limited in amount or insulated in character, is wrong in itself, and though it should cause little immediate evil, is most dangerous as a precedent. It goes to shake the security of property, and consequently to darken the hopes of enterprize, and paralyze the labors of honest industry. Whilst, therefore, it is the duty of the legislator to refrain constantly from any such abuse of power, it is not less the part of the wise and prudent

judge to give such a construction to legislative enactments, as will constantly, with any reasonable interpretation of language, support and maintain this fundamental principle of private rights and equal law. The retroactive operation of any law, so as to divest previously vested interests, is never to be presumed. To return to the case before us. Cummings, the deceased husband, had, before the statute, and before his wife's naturalization, a full estate in the lands in question, unencumbered by dower. His creditors (for he was a *debtor*, as is manifest from his bankruptcy soon after,) had a just, it may be a legal lien upon his whole estate ; and if the lien had been actually that of judgments, the operation of the retrospective right of dower would divest that lien to the extent of the dower. Now, is it not contrary to the most valuable principle of our laws, that any act, either of congress or of our state, should be so construed as retrospectively to grant to the wife or widow the right of dower in lands which were but yesterday wholly covered by the rights of others— by those of her husband's creditors, or of purchasers from him, or of subsequent parties deriving title from those, long after. Nor would the present be a single and insulated case, arising under such a construction of this law. So numerous are the naturalized citizens, whose wives, children and near relatives resident among us are still aliens, that other cases more or less similar might arise every day. If this retrospective legislation is just in one case, why not in another ; and where is the line to be drawn which can securely fence any honestly acquired right of property from the unexpected intrusion of some grantee of legislative bounty ?

I should be unwilling to believe that to be a sound construction and interpretation of the law of the land, that could lead to such a conclusion in any instance. On the other hand, the conclusion at which I have arrived, from an examination of the statutes and the authorities, (without regarding this special consideration,) are such as lead to no such dangerous results. If the law be, as I confidently think it must be, in opposition to the high authorities in our courts that have decided otherwise, it can interfere with no former rights whatever, either directly or indi-

rectly. It affects none but those of the alien himself, by his own consent, and that of the state whose bounty or liberal policy relieves him from prior disabilities.

By Senator WAGER. I should be strongly inclined to reverse the judgment of the court below, if it could be done without overruling one of the decisions of this court made in a case which I hold to be directly in point. I allude to the case of *Forgey* v. *Sutliff*, 5 *Cowen*, 713. I think the court there mistook the rule which should be applied in the construction of the enabling statutes ; but that decision now constitutes the law of the land, and we cannot overturn it without violating a more essential principle than the one which was violated by the court in making the decision. In correcting an error we should commit a greater.

The case of *Forgey* v. *Sutliff*, is imperfectly reported, but enough can be learned from it, as found in 1 *Cowen*, 89, to show that the court intended to hold that an alien widow might take her dower by virtue of the enabling statute of the 26th March, 1802, as a purchaser, and not by virtue of the naturalization of her husband. This idea, derived from an examination of the case as reported in 1 and 5 *Cowen*, is confirmed by a perusal of the opinions of Chancellor *Sanford* and Senator *Colden*, delivered for affirmance in this court, copies of which have been furnished by the counsel for the defendant in error in this cause, to the members of the court since the argument ; they not having been fully reported in 5 *Cowen*. The *chancellor*, in his opinion, regards the widows taking under the enabling statutes, as a taking by *purchase*, within the meaning of that statute, though upon strict principles of law, a widow takes her dower neither as purchaser, devisee or heir. Senator *Colden*, in the opinion delivered by him, takes the two grand divisions of the modes of acquiring real property, *descent* and *purchase*, as embracing all ; under the latter of which, he held that the widow of Sutliff took her dower ; and that, consequently, she came within the act of 26th March, 1802. The preamble to that act recites the inducements that operated upon the legislature for its passage. It was

to encourage aliens to come and reside in this state and invest their capital, by means of which agriculture and manufactures might be improved. Having, therefore, strict regard to the objects of the law, the terms " *purchases of land made or to be made,*" would not apply to the widow's right of dower, but would be confined to purchases by bargain and sale. But as I have before remarked, this court have decided this point against my opinion, and it is no longer an open question.

The only difference between this case and that of *Forgey* v. *Sutliff* is, that here Mrs. Cummings was an alien wife of a natural born citizen, and in *Forgey* v. *Sutliff* the claimant was an alien wife of a naturalized citizen, during the seizin of their husbands. It was, in that case, contended that the naturalization of the husband naturalized the wife, and that she therefore took as a naturalized citizen. But this doctrine was repudiated by the court, and the case was left to turn solely upon the point, whether she took under the act of 1802, as a purchaser. The naturalization of Sutliff conferred upon him all the rights of a citizen, in relation to taking, holding, and conveying real estate. Such rights, only, had the husband of the present claimant. As citizens, they stood upon equal ground, and their widows should be held to claim their dower upon the same ground.

There were other important points discussed in this cause, but as they have all been disposed of in a perfectly satisfactory manner by the court below, I shall content myself with the above remarks and vote for an affirmance of the judgment.

On the question being put, *Shall this judgment be reversed ?* the members of the court divided as follows :

*In the affirmative* : The CHANCELLOR, and *Senators* J. BEARDS-LEY, BECKWITH, HULL, HUNTER, E. P. LIVINGSTON, H. A. LIV-INGSTON, LOOMIS, MAYNARD, SKINNER, VERPLANCK, WILLES—12.

*In the negative :* The PRESIDENT OF THE SENATE, and *Senators* DOWNING, HUNTINGTON, LACY, LAWYER, LEE, SPRAKER, WAGER—8.

Whereupon the judgment of the supreme court was REVERSED.