Bronson, J. dissenting.
The pretence that this tavern furniture was in the possession of one of the boarders in the house, and not in the custody of the keeper of the inn, shows to what poor shifts men will resort for the purpose of evading the law, and getting rid of the payment of their debts. There was no change of possession. Nothing was done beyond an attempt, by creating a formal paper lien, to place the goods beyond the reach of legal process.
If the plaintiffs were, in fact, creditors of Davids, they neither sued for their debt, nor did they take the whole or any portion of his property in satisfaction of the demand. They were content that their debt should remain unpaid, and that the insolvent debtor should go on, as he had before, in the full enjoyment of property which rightfully belonged to his creditors. This is not all. The plaintiffs were not only content to forego their own rights, but they were willing to lend further aid to the debtor by taking a nominal conveyance of his effects, and thus stepping in between him and those creditors who might resort to legal coercion for the recovery of their demands.
It requires but a moderate knowledge of human affairs to understand how men reason in cases of this character. It is but too commonly the case that the insolvent debtor is unwilling to surrender the remnant of his estate to the creditors from whom it was obtained, and to whom it rightfully belongs; and looking upon that man as a tyrant who says, “ Pay me what thou owest,” he is soon able to persuade himself that it is justifiable to defeat the oppressor by any means which wear the semblance of legal authority. He sometimes contents himself with giving a preference to a favored creditor, by confessing a judgment, or by making an actual transfer of his effects; and this the law tolerates. But as that course involves the necessity of giving up his property, he more commonly resorts to some contrivance by which, under the forms of law, he hopes to retain the undisturbed enjoyment of his goods while the execution creditor is defeated. This device is a mortgage or bill of sale of his personal effects. He casts about for *451 some relative or friend who either has or pretends to have a debt, and who will consent to receive a conveyance with the understanding, either express or implied, that the property is not to be removed; and having signed the deed and deposited it in the clerk’s office, the debtor goes on with his affairs just as though nothing had happened, and sets at defiance those creditors who may be so unreasonable as to insist on the payment of their demands. Now gloss this over as we may, it is nothing but a scheme ££ to delay, hinder and defraud creditors,” which the statute law for nearly three centuries, and the common law at all times, has declared utterly void.
Questions of this kind have so frequently been before us, and we have so often held these pretended transfers of personal property void as against creditors and purchasers, that I shall spend no time in reviewing the decisions. Without noticing other features in this case, it is enough that there was no change of possession. That fact alone, according to the law of the land as settled by many judicial decisions, was sufficient to invalidate the mortgage as against an execution creditor, and a new trial should therefore be denied.
But we are referred to a recent decision of the court for the correction of errors, in the case of Smith & Hoe v. Acker, (December, 1840,)* as laying down a different doctrine, and as being moreover a decision of paramount authority. I have procured copies of the papers in that case, and a newspaper copy of the only opinion delivered in favor of the judgment which was rendered by the court for the correction of "errors; and it must be admitted that a new doctrine was laid down in that case. Indeed, the learned senator who delivered the prevailing opinion, commenced by *452 saying, “ My vote will directly conflict with the whole course of decisions of the supreme court upon the principal question.”. That this avowed departure from the law as it had been previously settled, has made a precedent of “ paramount authority,” I most respectfully deny. Let us notice very briefly what the case was, and how it was disposed of.
Looking at the case in the most favorable light for the plaintiffs, Smith & Hoe, they were creditors of Bell in the sum of ten thousand dollars, and Bell on the 26th of March, 1837, gave them a mortgage on his printing press, types, household furniture and other property, conditioned for the-payment of ten thousand dollars, with interest, on the first day of May then next, with a provision that until the debtor should make default in payment, he should “ remain and continue in the quiet and peaceable possession of the said goods and chattels, and the full and free enjoyment of the same.” Bell continued in possession of the property until the 20th of January, 1838, when the defendant Acker, sheriff of New-York, levied on the printing press, by virtue of an execution in favor of Abraham Voorhis; and for that taking an action was brought in the New-York common pleas, where the plaintiffs were non-suited. The judgment of the common pleas, after being affirmed in this court, was reversed by the court for the correction of errors, on the ground that the question of fraud should have been submitted to the jury.
Without mentioning any other feature calculated to throw discredit on the bona fides of the transaction, I will only notice three leading facts: First, there was no change of possession; second, it was expressly stipulated that there should be no change until default should be .made in payment; and third, the debtor remained in possession until the execution was levied, which was nearly nine months after the mortgage had become forfeited by a default in payment. Now it'was said so long ago as Twyne's case, (3 Co. R. 80,) that “ continuance of the possession in the donor is a sign of a trust;” and it was resolved, “that notwith *453 standing here was a true debt due to Twyne, and a good consideration of the gift,” yet the transaction was not bona fide ■ within the proviso to the act of 13 Eliz., because there was a trust that the donor should remain in possession. In the case of Smith & Hoe v. Acker, there was not only the “ sign of a trust,” but there was an express trust between the parties. Bell was not to be disturbed in the enjoyment of the property. This privilege must have been- worth at least seven hundred dollars a year—the interest upon the value of the property mortgaged— to say nothing of the deterioration of the goods "by time and continued use. E we stop here, this decision, E followed, will not. only upset all the adjudications on this subject under the revised statutes, but it will overthrow many precedents of. a much more ancient date.
But let us proceed a step further. Assuming that Bell’s mortgage was originally valid, all his interest in the property became forfeited by the non-payment of the money on the first of May in pursuance of the condition, and the title of the mortgagees thereupon became absolute. (Langdon v. Buel, 9 Wendell, 80. Patchin v. Pierce, 12 id. 61.) What was before a mortgage, had now become an absolute sale of the property; "and yet Bell continued in the quiet enjoyment of the goods until he was disturbed by the execution of Yoorhis nearly nine months after the mortgage had become forfeited. This possession was inconsistent with the deed, and in such cases there never has been much room for question that the transac- • tion was void as against creditors, and that the fraud was a question of law for the court, and not of fact for the jury. (Sturtevant v. Ballard, 9 John. R. 337.) In Divver v. McLaughlin, (2 Wendell, 596,) the mortgagor continued in possession after a default in payment until the goods were seized by a creditor. In an action by the mortgagee for the taking, the right of the creditor was maintained, and that too as a question of law. The court of C. P. had refused to , nonsuit the plaintiff, and for that cause the judgment was reversed. The case was decided before the' revised statutes took effect.
*454 It is worthy of remark, that neither this question, nor the case of Divver v. McLaughlin, which is precisely in point, was oven mentioned by the senator who delivered the prevailing opinion in Smith & Hoe v. Acker; and it would be strange indeed if any decision should have much force as a precedent upon a point which was never considered by the court.
But our decisions have gone beyond this point, and held the mortgage void before, as well as after the money fell due, if there was no change of possession. They have had reference to the new provision in our statute, which applies alike to mortgages and absolute sales, and in both cases requires an “ immediate” delivery of the property.
Without again going into questions which have already been sufficiently discussed in the books, a few remarks may be proper, by way of explanation, This court has never denied that there may be many cases where the question of fraud in relation to these conveyances will be one of fact for the jury. There may be a question upon the evidence whether the possession was actually, or only colourably changed—whether the change was continued, or only of a temporary character— whether the goods were of such a nature, or were so situated that there could not be an immediate delivery, and then whether possession was taken within a reasonable time; or, if there was an actual and continued change of possession, whether there was a bona fide debt or other good consideration for the transfer. And beyond all this, there may still be a question of good faith; for although the property may be delivered, and a sufficient consideration paid, yet if the real object of the parties was to delay, hinder or defraud creditors, the transaction cannot stand. In eases of a mixed character, such as have been mentioned, the question of fraud, or the facts out of which the inference of fraud may arise, must undoubtedly be submitted to the jury; and it is a great mistake to suppose that this court has ever held the contrary doctrine. But when there is no dispute about facts— when it plainly appears that the possession was not chang *455 ed, and there was no obstacle in the way, other than the interest, convenience or accommodation of the debtor, then it has been held that fraud is an inference of law to be declared by the court; and I see nothing in the reasoning of the court, in the case of Smith & Hoe v. Acker, to change the opinion I have heretofore entertained upon that point.
True, the statute declares that the question of fraudulent intent shall in certain cases be deemed a-question of fact, and not of law. In Beekman v. Bond, (19 Wend. 444,) an attempt was made to show that this provision had ample scope for operation without touching, and that it did not in fact touch, this point. It is not only enacted that conveyances made with a fraudulent intent shall be void, but the legislature has gone farther, and singled out and seized upon that common and strong badge of fraud—continued possession in the vendor or mortgagor—-and declared, that without an immediate delivery, the transfer “shall be presumed to be fraudulent and void.” The law itself makes the inference, and nothing is left for a jury.
I am aware that this is not the whole of the section. It proceeds to declare, that the presumption mentioned in the first clause shall be conclusive evidence of fraud, unless it shall appear that the sale “ was made in good faith and without "any intent to defraud.” How is this “good faith” to be made out? Proving a consideration, notoriety, and the like, although very well so far as they go, will not be enough, for the plain reason that the statute requires a change.of possession. When that is wanting, the statute is so far from allowing that there can be “ good faith” towards creditors and purchasers, that it declares the transaction, as to them, “ fraudulent and void.”
But suppose that on proving a consideration, &c. the evidence of fraud is no longer conclusive, the most that can justly be said is, that the last clause of the section has ■then ceased to have any influence upon the transaction. The first clause is not nullified, and the declaration still remains, that the sale shall be “presumed to be fraudulent and voidarid without altering the language of the stat *456 ute, there is, I think, no way in which this presumption can be got rid of, so long as the fact out of which it springs—unchanged possession—continues to exist. «
It may be quite easy to call this a perversion, or to declare that the statute plainly means something else; but such remarks prove nothing.
As I understand the statute, the moment it appears that the possession was unchanged, the law draws from that fact a presumption of fraud; and this presumption becomes conclusive, unless the fact out of which it springs can be explained. It is not enough to show a good consideration, notoriety, &c. without also explaining the possession. And it is no explanation of that, to show that it was convenient for the insolvent debtor to keep his property after he had sold it, or that the vendee was his relative or friend and disposed to do him a kindness. The statute has made no such exception, and those, who make it are more benevolent than the law of the land. ;
It may be remarked here, that this court has never decided, as seems to have been supposed in Smith & Hoe v. Acker, that “ evidence of the change of possession being impracticable, is the only evidence of good faith required by the statute;” and having never said any thing of the kind, the court cannot be responsible for the absurdities and inconsistencies which would have followed, had they fallen into such a blunder. It has .undoubtedly been held, that whatever else may appear, the fact of unchanged possession must be explained ; but it has never been intimated that the satisfactory explanation of that fact—as by showing an immediate delivery impracticable—would alone be sufficient. Beyond all doubt, a vendee who leaves the goods with the debtor, must not only show a good reason for doing so, but he must make it appear that there was a sufficient consideration and good faith in the whole matter.
If we have not mistaken the true import of the statute, it is not very important to inquire whether the rule it gives be a salutary one or not; and I will not, therefore, stop to vindicate the- remarks which fell from me' on that sub *457 ject in Randall v. Cook. Although those remarks have on several occasions been made the text for some very spirited and witty comments, I am quite content to leave both text and comment to go for whatever others may think them fairly worth.
The suggestion that it may be best for creditors that the mortgagor should be suffered to remain in possession, because he will thus be enabled to make money and pay his debts, is objectionable in every point of view. Who has ever heard of a debtor who either bettered his condition or paid his creditors, after he had got to the point of covering up his goods by a mortgage or bill of sale? The thing may sound well enough in theory, but it will prove wholly fallacious in practice. But the conclusive answer to the argument is, that creditors whose debts are due have the right to judge for themselves whether they will grant indulgence, or resort to legal process for the recovery of their debts; and the law declares, that all conveyances made to delay, hinder or defraud them, shall be utterly void.
If after thirty years of legislation for their relief, our laws are not yet sufficiently favorable to debtors, let us proceed by open and direct means to grant them further privileges. If enough of their property has not already been exempted from the reach of legal process, let the exemption be extended; but wherever it ends, let the creditor have efficient means for reaching the residue. Do not let us hold out the hope of legal redress when it is so likely to prove delusive that prudent men dare not venture upon the experiment of seeking it. If it-be not enough to exempt particular kinds of property from execution, let us have general íí stop laws,” I certainly would not be understood as approving of any such questionable expedient. But if debtors must have “relief” in some form, it is better that it should be brought about by direct legislation; than by yapping existing laws to the exigency of the times.
Owing to the peculiar circumstances1 of the times, the recent struggle to uphold chattel mortgages and bills of sale *458 without a change of possession, has been a severe one. The fortunes of many men had suddenly fallen into ruin by the failure of the hazardous speculations in which they had embarked ; and in their fall they had carried along friends who were chargeable with no other imprudence than that of having loaned their names to those who were in haste to become rich. Some had suffered by the negligent, and some by the fraudulent conduct of those who had been entrusted with the care or management of their property; while others had" been overwhelmed by the general derangement of business, and’ the alarm which prevailed through the whole commercial world when an overstrained system of credits so unexpectedly gave way. The man who had lived in affluence, and the man who fancied he had inexhaustible stores of wealth almost within his reach, had, in some respects; shared a common fate. The riches of the one had taken wings, and the gilded phantoms of the other had suddenly disappeared. Neither could descend at oncé to the level of his new condition and prospects. When creditors began to press, some made voluntary transfers of their goods to friendly assignees, who left the property where they found it under the pretence that the debtor could best wind up his own affairs. Others executed mortgages and bills of sale of their household furniture and other personal effects, to friendly creditors who would consent to stand between the property and the expected execution. In the meantime no body was paid. Creditors who resorted to legal process were not paid, because an assignment stood in .their way. The assignee was not paid, because he did not take the property. He took nothing but a nominal paper lien; and when the property had been .dissipated, his debt remained in as fall force as though nothing had happened. In short, these transfers answered the precise end which they were designed to accomplish. They left' the debtor to eat, to drink, to wear, and to squander his effects, while the creditors from whom the property was obtained, if they were not actually suffering from want, were at the least delayed, hindered and defrauded *459 of their rights. Although the circumstances of many debtors and the condition of their families were such as to appeal with great force to. the sympathies of all, still the courts were bound to see that the stream of justice flowed onward in its accustomed channel. If judges had the wish, they had not the power to bend the law to hard cases, and all such transfers as those to which I have alluded were declared fraudulent and void. .
After the question had been settled by the two highest courts of original jurisdiction in the state, an appeal was taken from a decision of the chancellor, and the case of Stoddard v. Butler, (20 Wendell, 507,) was brought before the court for the correction of errors. The decree was affirmed, though by an equally divided vote.. Debtors and their sympathizing friends then turned to the legislature for relief, and a bill was soon after brought in to legalize mortgages of personal property, without a change of possession. I was glad to see that movement; not because I thought the measure a good one, but because, if the law was to be altered, I wished to see the change made by legislation, and not by judicial decision. Statutes are usually made to operate prospectively, and do not disturb rights already acquired. But when the law is changed by judicial decision—especially on a question of such widely extended influence as that relating' to conveyances of personal property among a commercial people—it is impossible to foresee all the evil consequences- which may follow. Such decisions act upon the past, as well as the future; and no man can feel secure in a community where that which is settled law to-day, may .be overthrown to-morrow—in a mode which has an ex post facto operation, and thus either legalizes acts which were originally void, or makes those things vicious which were faultless when they happened. To say nothing of personal security, there can be no stable title to property where great and sudden changes in the law are brought about without the intervention of the law-making power.
' Changes in the forms and modes in which judicial pro *460 ceedings axe conducted, may sometimes be made by the courts, in a way which will do harm to no one. And in relation to questions affecting the title to property, I do not intend to say that there can be no improvement in jurisprudence without the intervention of the legislature. Judges, like other men, will feel the influence of the world around them, and the law cannot remain absolutely stationary while other sciences are advancing. The impulse which carries forward the work of civilization—which opens and enlarges the mind, and improves the social condition of man—cannot fail to reach the halls of justice; and many of those rugged features in the law, which are no longer suited tovthe condition of the people, will gradually disappear, and give place to doctrines and maxims better adapted to the advanced state of society. The common law is not so inflexible as a statute. It embodies maxims which provide, in some degtee, for its own improvement, and give the assurance that its leading principles cannot fall very far behind the spirit of the age. But these changes must be wrought out by such slow and imperceptible degrees that no one can mark the precise period when the transition happened. They must not be so sudden that any man can say he has lost his house, his lands, or his goods. When there is any deformity in the law which cannot await this slow process of amendment, it is for the legislature, and not the courts, to apply the remedy. Legislation leaves men secure in the rights which they already possess, and only establishes new modes of acquiring and losing rights for the future.
The bill before the assembly for altering the law and legalizing mortgages of personal property without a change of possession, was debated very much at large at different periods of the session of 1839. At ‘the first, a considerable majority of the house seemed disposed to pass the bill. But the more the matter was discussed, the more the policy of the measure was doubted. The original majority in favor of the project soon began to dwindle, and before the session closed, the bill was lost—a majority voting against it.
*461 I have omitted to mention that this subject was also before the legislature in several forms in the preceding session of 1838, when a bill was before the assembly to legalize mortgages without á change ■ of possession; but the project seems not to have found favor with the house. Some account of these movements, though an imperfect one, may be seen in the Assembly journals of 1838 and 1839.
Thus terminated, as I had supposed, the agitation of this question, unless it should again be brought before the legislature. Certainly no one could anticipate that a question which had passed through all the courts of the state with a uniform result, and upon which one branch of the legislature had twice deliberately refused to interfere, was again to be brought forward as a proper subject for judicial discussion.
The case of Smith & Hoe v. Acker was not discussed at the bar by counsel, but was submitted on written arguments, in which particular it is like the case of Root v. Stuyvesant, (18 Wendell, 257,) which has been virtually overruled on several 'occasions by the same court which pronounced the judgment. Whether it happened in Smith & Hoe v. Acker, as it has, I believe, happened in other cases, that the counsel were all employed1" by the same party, I am unable to say; but I find in the "printed brief on the part of the defendant in error, admissions which would not be very likely to come from counsel whose client was deeply interested to uphold the judgment which was reversed. I notice also that some of the arguments which might very well have been pressed upon the consideration of the court, were either very lightly touched, or entirely overlooked. I mention these things, because the weight of a judicial decision may depend in a considerable degree Upon the aid which the court received from the discussions :at the bar. No man can feel entirely sure in his conclusions until the subject has been viewed in all its various aspects.
Although the case of Smith & Hoe v. Acker plainly departs from the law as it had been previously settled, it has *462 been strongly urged that, as the decision of a court of last resort, it is a conclusive precedent which must be followed until the legislature shall change it. (See per Colden, senator, in Mackie, v. Cairns, 5 Cowen, 567, 9.) 'It is undoubtedly true, that the other courts of Westminster Hall have generally considered themselves bound by the decision of the house of lords, though more than one instance might be mentioned where that doctrine did not prevail.(a) But it may be remarked in relation to the house of lords, when sitting as a court of review, that it not only abides by its own judgments, but considers itself bound by the law as it has been settled by other courts, whatever may be its own notions of the matter as an original question. No case can, I think, be found, where any member of that court has -started with an avowal that his “ vote would directly conflict with the whole course of decisions” of any other court upon the question to be reviewed. When there has been a uniform “ course of decisions” in England on a statute or any other branch of the law—especially in cases where those decisions affect the title to property—the house of lords, however erroneous those decisions may be deemed, does not feel itself competent to apply a remedy without the concurrence of the house of commons.
It is going quite too far to say -that a* single decision of any court is absolutely conclusive as a precedent. It is an elementary principle, that an erroneous decision is not bad *463 law—it is no law at all: It may be final upon the parties then before the court, but it does not conclude other parties having rights depending on the same question.
I will refer to a, few cases, for the purpose of showing that our court for the correction of errors does not abide by its own decisions. The case of Murray v. Riggs, (15 John. Rep. 571,) was very much shaken, if not completely overturned, by the case of Mackie v. Cairns, (5 Cowen, 547.) Forgey v. Sutliff, (7 Cowen, 713,) was virtually overruled by Priest v. Cummings, (20 Wendell, 338.) The case of Livingston v. The Peru Iron Company, (9 Wendell, 511,) so far as it stands on the reasons assigned for the judgment, was wholly disregarded in Humbert v. Trinity Church, (Dec. 1840.) (b) In Root v. Stuyvesant, (18 Wendell, 257,) it was held that a will, void in part, though only to a very limited extent, was void in toto. This case has been repeatedly overruled. (Hone v. Van Schaick, 20 Wendell, 564. Kane and wife v. Gott, [Dec. 1840.] (c)) And see Darling v. Rogers, (22 Wendell, 483.) These examples are sufficient to show, that our court of dernier resort does not regard its own decisions as conclusive by way of precedent: and if not so regarded by that court, it would be strange indeed if other courts were bound to follow them at all events, and without looking into the reason on which they stand.
There is a further reason why the decisions of the court for the correction of errors should not be implicitly followed. It is well known that some of the members of the court do not consider themselves tied down to what are sometimes called the strict and technical rules of law, but feel at liberty to decide according to their own sense of what is right in the particular case under consideration, without much regard to legal precedents. That this sentiment has not often found its way into reported cases, may be accounted for by the fact that it is more commonly adopted *464 by those members of the court who are not in the habit of preparing written opinions, than by others. And besides, cases in which such opinions have been expressed—to say nothing of those in which such opinions have been acted upon in silence—would be less likely to be reported than others, for the 'reason that lawyers—to which fraternity reporters usually belong—are in the habit of adhering with much zeal to legal precedents.
But we shall be able to find a trace of this doctrine in the books. There are several reported cases where its influence might be discovered on a close1 scrutiny; but it will be sufficient to mention one or two, where the sentiment is quite apparent. In Smith & Hoe v. Acker, which has so often been mentioned, the learned senator who delivered the prevailing opinion very frankly avowed that his vote would “directly conflict”—not simply with the judgment of this court in the particular case then under review, or- with any other single judgment of a recent date, but—“ with the whole course of the decisions of the supreme court upon the principal question.” He added, that the question seemed a very simple one “ to a mind not embarrassed by the decisions.” And after having thus thrown off the shackles of legal authority, he proceeded to assign the reasons for his judgment.
In Lovett v. Pell, (22 Wendell, 369,) it was held that a misjoinder of counts ■ in the declaration was not a sufficient ground for reversing a judgment; although the precise question had been decided the other way twenty years before in Cooper v. Bissell, (16 John. Rep. 146,) and although there never had been any conflicting decisions upon the question. It is true, that the learned senator who delivered the prevailing opinion, seemed to lay some stress upon the word mispleading in our present statute of amendments ; but as that word had been in the statute of jeofails for three hundred years—(it will be found in 32 Hen. YIH c. 30)—we cannot for a moment suppose that the decision turned on the notion that this was a new provision in the law. The court evidently thought itself at liberty to lay *465 down what was deemed a more wholesome rule than that which prevailed in Cooper v. Bissell, although that case had not only stood unimpeached long enough to give it sanction as a precedent, but was' at the time nothing more than declaring over again a point which had been settled a hundred and fifty years before, as abundantly appears by the cases referred to in the opinion of the chancellor. Here then is a case where the court, plainly and beyond all room for question, acted upon the principle that it was not tied down by adjudged cases, but was at liberty to follow its own sense of what Was right between the litigant parties.
The court not only acted upon this doctrine, but it was, I think, plainly avowed by the learned senator who delivered the prevailing opinion. He not only remarked, that the supreme court had followed a “rigid technical rule,” which means, I presume, that it had decided according to law, but he proceeded in the plainest terms to' admit, that the judgment which he proposed to reverse was in accordance with legal precedents both here and in England. It is then intimated, and subsequently repeated in the course of the opinion, that the question was open for review, because it had not been previously adjudged by the court for the correction of errors.
In Warner v. Beers and Bolander v. Stevens, [April, 1840,] (d) the same learned senator again touched upon this doctrine. After stating the inquiry, whether, certain associations fell within “the policy and intent” of a-particular restriction in the constitution, he proceeds to answer, that “if this were indeed the case, a court like this, organized expressly to qualify and regulate the decisions of inferior tribunals, (which must of necessity be governed by precedent and authority,) by infusing into the law a larger spirit of equity and general principle—such a court might well deem it their duty to disregard the rigid legal interpretation *466 of the language of the constitution, and to look only to its intent and ultimate object.” How far it was intended to go by way of affirming the power of the court for the correction of errors over the constitution, I will not venture to say; but, at the least, the language seems fairly to imply that that court is not, like inferior tribunals, necessarily governed “ by precedent and authority,” which is equivalent to saying, the court is not bound by the law of the land.
Without pursuing the subject further, it must be apparent that some of-the members of the court of the last resort claim for that high tribunal a much larger license in disposing of the questions brought before it than is exercised by other courts. Whether this be right or wrong, is a question upon which at this time I shall say nothing. I merely state the fact for the purpose of drawing the very obvious conclusion, that the decisions of that court, although final as between the parties litigant," are so far from being conclusive by way of authority, that they are entitled to much less weight than the judgments of those courts which consider themselves bound by legal adjudications. This must be so in all'cases. But where, as in Smith & Hoe v. Acker, the court has professedly departed from “ the whole course of decisions,” the judgment is entitled to no weight at all.
I cannot concur with my brethren in following a decision which we all agree is repugnant both to the statute and the common law.
There was no sufficient proof of a consideration for the mortgage from Davids to the plaintiffs; but as the judge did not put his decision upon that ground, I have considered the case as though a good consideration had been shown.
New trial granted.

 That case has been reported (23 Wendell, 653,) since this opinion was prepared. It is proper to add: that although other opinions are now published, Mr. Senator Hopkins delivered the only written opinion, as is said, in favor of the judgment .which was rendered by the court for the correction of errors in that case, and to his opinion reference is made on the present occasion.

 The reversal by the house of lords, of Lord Somers’ decree, in Kettle v. Townsend, (1 Salk. 187,) is one instance. Sir John Trevor, M. R. denied the authority of that decision, affirming moreover, that if the same case were to come again into the house of lords, they would decide differently. (Watts v. Bullas,1 P. Wms, 60, 1.) Lord Harcourt seems also to have refused to follow it as a precedent. (Id.p. 61, note.) Of. the same case, Lord Loughborough spoke as follows: “ I have no difficulty in saying, I think of that determination of the house of lords as Lord Harcourt and other judges have done.” Adding: “ Upon the journals of the house of lords, it appears no one was present upon that reversal who could know much of the matter; it was not determined by lawyers : and Lord Harcourt speaks of it certainly as not such a decision as he would follow: and one or two other judges have not treated it with much respect” (Hills v. Downton, 5 Ves. 565.)

 24 Wendell, 587.

 24 Wendell, 641.

 93 Wendell, 103.